UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 7 |
| TIMOTHY JAMES WILLIAMS, JR., and | ) | |
| ANDRIAN SHANNON WILLIAMS, | ) | |
| | ) | Case No. 15-71767 |
| Debtors. | ) | |
| JUDY A. ROBBINS, | ) | |
| United States Trustee For Region Four, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Adversary Proceeding** |
| | ) | **No. 16-07024** |
| DARREN DELAFIELD, UPRIGHT LAW | ) | |
| LLC, LAW SOLUTIONS CHICAGO LLC, | ) | |
| JASON ROYCE ALLEN, KEVIN W. | ) | |
| CHERN, EDMUND SCANLAN, and | ) | |
| SPERRO LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| IN RE: | ) | |
| | ) | Chapter 7 |
| JESSICA DAWN SCOTT, | ) | |
| | ) | Case No. 16-50158 |
| Debtor. | ) | |
| JUDY A. ROBBINS, | ) | |
| United States Trustee For Region Four, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adversary Proceeding |
| | ) | No. 16-05014 |
| JOHN C. MORGAN, JR., JOHN C. | ) | (consolidated with Adversary |
| MORGAN, JR., PLLC, UPRIGHT LAW LLC, | ) | Proceeding No. 16-07024) |
| LAW SOLUTIONS CHICAGO LLC, JASON | ) | |
| ROYCE ALLEN, KEVIN W. CHERN, | ) | |
| EDMUND SCANLAN, and SPERRO LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This matter comes before the Court on Complaints filed by the United States Trustee for Region Four ("UST") against Darren T. Delafield, John C. Morgan, Jr., Upright Law, LLC ("Upright"), Law Solutions Chicago, LLC, Jason Royce Allen, Kevin W. Chern, Edmund Scanlan, and Sperro, LLC on May 31, 2016 and June 30, 2016.  Separate adversary proceedings were filed in the bankruptcy cases of Timothy and Andrian Williams, filed by Darren Delafield ("Delafield") as an Upright partner, and of Jessica D. Scott, filed by John Morgan ("Morgan") as an Upright partner.  The two cases were consolidated for trial.  Sperro, LLC did not file a response, nor has it appeared in this action.  Default was entered against it on July 15, 2016 and August 17, 2016.  The remaining defendants are collectively referred to as the "Upright Defendants."  Extensive discovery took place and numerous motions were heard prior to trial.  A four day trial was conducted September 25-28, 2017, during which multiple witnesses testified and thousands of pages of exhibits were submitted.  All parties submitted post-trial briefing once the transcripts were prepared, which briefing was completed in late December 2017.  This matter is now ripe for resolution.

## FACTUAL BACKGROUND

This case involves yet another collision between traditional methods of providing – and policing – legal services to consumers for bankruptcy matters and attempts by attorneys and creative online marketers to tap into that market on a high-volume, multi-jurisdictional basis. On November 15, 2015, this Court issued an opinion in which it stated:

> [T]hese cases reflect the Pandora's Box of ethical issues opened by multi-jurisdictional practice [through] the "national law firm" business model, where law firms in distant locations around the country advertise on the internet, and then seek to retain a local attorney to become a local "member" – albeit one with limited, if any, rights other than in the cases they actually take.

2

*Robbins v. Barbour (In re Futreal)*, Misc. Pro. No. 16-00701, 2016 Bankr. LEXIS 3974, at * 41-42 (Bankr. W.D. Va. Nov. 15, 2016).

Little has changed.

The UST attempts to paint Upright and by association its local "partners" as money hungry "bankruptcy boiler room" operators that have stepped over – and will continue to step over – legal and ethical lines without hesitation in their inexorable quest for the next dollar.  The Upright Defendants, in turn, attempt to portray themselves as cutting-edge advocates for the financially distressed consumer.  They contend they have identified a void in the legal market for consumers that they are uniquely able to fill by using technology and the internet to match underserved areas of clients with attorneys who have the capacity and ability to fill their needs on a national basis, all while staying within the bounds of the law.

This case was aggressively litigated on both sides. The Court's findings of fact and conclusions of law follow below.[1]

## **FINDINGS OF FACT**

### I.      **Overview of the Genesis and Structure of "Upright Law"**

Upright Law, LLC is a d/b/a for Law Solutions Chicago, LLC ("LSC"), an Illinois limited liability company.  LSC also operates under various other assumed names, including Jason Allen Law, LLC, Allen Chern Law, Allen Chern LLC, and Allen & Associates, LLC among others.  In at least one instance, Upright Law is referred to as "a service of Allen Chern Law LLC."  UST Ex. 3-7.  According to Kevin Chern ("Chern"), the members of LSC are Chern, Jason Royce Allen ("Allen"), and David Leibowitz ("Leibowitz"), all members of the

---

[1] Where appropriate, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact.  *See* Fed. R. Bankr. P. 7052; 9014(c).

Illinois bar.[2]  Tr. 60-61, Day 3.[3]  The mangers of LSC are Chern and Allen.  Chern is the

managing partner of LSC, Allen is its chief operating officer, and Leibowitz is its chief legal

officer.

Chern has a past business history with an individual named Edmund Scanlan ("Scanlan"),

whose expertise is internet marketing, among other things.  Scanlan is not an attorney.  He holds

the title of executive director of LSC, although he holds no actual ownership interest in LSC.

Scanlan is paid a base salary of $200,000.00 by LSC for which he receives an IRS Form 1099,

presumably as an independent contractor.  LSC has very few actual employees – the ones it does

have are in-house Chicago attorneys – instead leasing most of its employees from Mighty Legal,

LLC.[4]  Mighty Legal, LLC in turn is owned by Justiva, LLC, which is owned by Chern, Scanlan,

Allen and some others not parties to this litigation.  Justiva, LLC also owns Royce Marketing,

LLC, which provides marketing services to LSC.[5]  Scanlan does not share in the profits or losses

of LSC.  However, for all practical purposes, LSC is the only client of both Mighty Legal and

Royce Marketing, and the arrangements with Mighty Legal, Royce Marketing – and ultimately

Justiva – allow for significant funds generated by LSC to flow to Scanlan, Chern, and others.[6]

Chern testified that, while working with Scanlan to provide online marketing services to

small law firms, he identified "that there was an enormous gap between the number of

consumers who are actually reaching out and saying that they need legal assistance and the

number of attorneys that are interested in proliferating information about their availability to

---

[2] Leibowitz has a less than 1% interest in LSC.  He is also a Chapter 7 panel trustee in the Northern District of Illinois.  UST Ex. 25, pp. 30, 45.

[3] References to the trial transcript are described as "Tr." and by day of testimony.

[4] LSC pays Mighty Legal a factor of 1.1 times the actual payroll cost to Mighty Legal for its leased employees.

[5] Justiva trademarked "Upright Law" and LSC pays licensing fees to Royce Marketing, as well as fees for the use of the domain name www.uprightlaw.com which Justiva also owns.  UST Ex. 30, Scanlan Dep. Tr. at 15; Joint Stipulations of Fact ("Stip.") ¶ 12.

[6] Allen testified by deposition that neither he, Chern, nor Scanlan took salaries from Mighty Legal or Royce Marketing. UST Ex. 26, Allen Dep. Tr. 36-38.

provide services to those consumers." Tr. 55, Day 3. In 2013, Chern approached Allen, who at

the time ran LSC, and discussed joining with him to attempt to match up on a multi-jurisdictional

basis attorneys who were looking for work with consumers who needed bankruptcy assistance,

but, for a variety of factors, were unable to obtain counsel. According to their research, clients

overwhelmingly preferred not coming into "brick and mortar locations," instead they preferred

receiving legal services without the burdens of travel. This led to the establishment of a "remote

onboard process for clients," with LSC centralizing its operations in Chicago and abandoning the

traditional client office-visit arrangement. Tr. 58-59, Day 3. Unless otherwise described in this

Opinion, "Upright Law," "Upright" and "LSC" are generally referred to as one in the same.

### A.  The "Onboarding" Process

The trial evidence reflected that when a prospective client searches the internet for a

bankruptcy attorney and comes across Upright Law, the client generally reaches out one of two

ways: they either call Upright Law or request information through an online request form. This

reach out, in turn, prompts a call back from a "client consultant." In 2015, Upright had a

bifurcated client intake process involving non-attorney personnel in Chicago called "client

consultants" and "senior client consultants." Client consultants were junior employees whose

job it was to gather basic information and probe whether the prospect was really interested in

filing for bankruptcy, whether they had the ability to pay for services, and whether they were the

decision maker for the family.[7] Chern, Tr. 88, Day 3. If those qualifications were met, the

prospect was passed on to a senior client consultant.

Senior client consultants were usually former client consultants who had been promoted

after a period of time. According to Chern, their job was to identify the consumer's motivations

---

[7] In 2017, Upright eliminated the title client consultant. All client consultants became "senior client consultants."
Chern, Tr. 6, Day 4.

and desires, what goals they were trying to achieve, and whether there was a precipitating event that was driving them to file. *Id.* at 88-89. These individuals are not attorneys and are paid a base salary plus commission. Sales employees were also trained in a boot-camp type arrangement. They were provided with a "Playbook," which taught them a variety of methods to "close" the sale of bankruptcy services to individuals seeking relief.

For example, UST Exhibit 37 is an Upright Law "Sales Play Book," which provides at Chapter I "Sales Rules & Theory – Close or be Closed." It includes topics such as the "Pitch Outline," the "Pitch Script," "Moving to the Close," and "Objection Handling." It is replete with high pressure sales tactics, some of which recommended to "close" the sale are unsettling to the Court.[8] Under objection handling, senior client consultants are taught to respond as follows if a prospect says "I need to pray about it":

> I appreciate that. I pray about every decision I make myself. How are you most comfortable paying? Let's pray together. I trust God won't mislead either of us. I am willing to accept God's will for the both of us.

UST Ex. 37, p. 12. Moreover, if a prospect said, "I need to talk to my Wife/Husband," senior client consultants were advised to respond with responses including: "I agree, and you should, but if your husband/wife is anything like mine, he/she never tells me no when I really need or love something, and I never tell him/her no." *Id.* Or, "[b]etter to ask for forgiveness than ask for permission, so let's get you going right away[.]" *Id.* Under the Playbook's "Now or Never" pitch, Upright sales people were advised to state as follows:

> This is the offer I am making you for right this moment in time, and it is a now or never offer as I will not be able to make this available tonight, tomorrow, or event [sic] later today. Because we have an incentive available to us right now, I am

---

[8] The word "close" is used 28 times in this 13-page document. Chern testified the Playbook was written by Allen, and that the versions of the Playbook were later revised from time to time. A number of these or similar sales techniques found their way into "Upright University" training materials. *See, e.g.*, Chern, Tr. 13-14, Day 4; UST Ex. 36.

able to offer this to you now but it expires when we get off the phone.  Let's take advantage of the incentive.

UST Ex. 37, p. 7.  If a prospect is already represented by counsel, sales personnel are directed to "[t]ell the client to fire their local attorney, they can send an email, then they can hire us." Upright Ex. J7, p. 11.[9]

One of the senior client consultants, Brandon Fox ("Fox"), testified by deposition that he was paid a base pay of $40,000, plus a commission tied to how may "closes" he obtained.  Tr. 289, Day 1.  Another senior client consultant, Angelo Walsh ("Walsh"), testified by deposition that each client consultant had a minimum requirement to meet or no bonus would be paid, and each "salesman has a specific number or amount of fees collected they need to hit in order to remain employed."  Tr. 304, Day 1.  The sales numbers were tallied on a 45 day basis, and changed frequently.  Tr. 289, 304-05, Day 1.  Fox testified that he understood he was hired to "sell[] bankruptcy to people."[10]  Tr. 287, Day 1.

The non-attorneys were instructed they could not provide legal advice.  Chern, Tr. 169, Day 3.  Fox and Walsh confirmed that instruction.  However, in several instances in the matters before the Court, those instructions were not followed by Upright non-attorney personnel.[11]  The conversations with the debtors involved in this action were recorded by Upright Law, and those transcripts were introduced into evidence by the UST.  UST Exs. 3-1, 4-1.  Among other things, prospects were told that they were a "perfect candidate for filing for bankruptcy," and their filing chapter was pre-selected before they ever spoke to an attorney.  UST Ex. 3-1, Tr. pp. 11-12, 43-45.  A prospect was examined by a non-attorney to "see if you qualify to file," conceded by

---

[9] Upright Exhibit J7 is an information tutorial with a quiz at the end for training purposes.

[10] The UST, based in part on testimony from Chern, describes Upright as a "boiler room" operation.  UST Brief, at 4-8; Chern, Tr. 33, Day 4.  Upright vigorously disputes that characterization.

[11] Upright's current system of live call monitors now listen for instances that might constitute the unauthorized practice of law.  Violations are reported to the office of general counsel.  Upright has a progressive discipline system that leads to additional training and ultimately to a "three strikes" and "out" policy.  Chern, Tr. 173-76, Day 3.

Allen to be unauthorized.  UST Ex. 3-1, Tr. p. 4; UST Ex. 26, Tr. pp. 84-85.  In addition, one

client was advised, after asking about whether certain debts would be included in her case, that it

would be up to the trustee to make that determination.  UST Ex. 3-1, Tr. p. 21.  In at least one

instance in this case, a debtor was told she could leave a debt off her bankruptcy schedules to

protect an ex-spouse.[12]  UST Ex. 4-1, Tr. pp. 30-31.  One prospect was given the advice to hide a

vehicle from the lender, despite Allen's testimony that such a suggestion was "off-script."  Chern

confirmed such advice was outside the employee's authority.  UST Ex. 3-1, Tr. pp. 75-77; Chern

Tr. 252, Day 3; UST Ex. 26, Allen Dep. Tr. p. 219.[13]  All of these discussions took place before

a prospective client ever spoke with an attorney, either in Chicago or locally.

The sales personnel were supervised by a non-attorney sales director, and that sales

director, in turn, reported to Allen.  "Onboarding attorneys" in Chicago are supposed to confirm

that the non-lawyers did not provide the client with any legal advice,[14] but as seen, this check

appears less than effective based on the evidence at trial.  Once a client was "closed" or sold on

bankruptcy, and money was received or payment scheduled, an "oral retention" agreement was

entered into and the client was then transferred to an attorney.  No conflict check was run before

a client was presented with the oral retention agreement.[15]  Among other things, the oral

retention agreement used in 2015 provided  if the client is seeking to file bankruptcy under a

certain chapter of the Bankruptcy Code, that the "firm does not represent you until you talk to

---

[12] Because Brandon Fox's testimony was presented by deposition, the Court had little opportunity to weigh his credibility, but when asked if instructing debtors they could leave debts off their schedules was part of his training, he said "From what I recall, yes." UST Ex. 21, Tr. pp. 46, 59.  Kevin Chern denied that. Tr. 179, Day 3.  The simple fact is Fox did give this advice to Jessica Scott.

[13] This suggestion was made in connection with the "New Car Custody Program," discussed *infra*.

[14] Chern, Tr. 169-70, Day 3.

[15] Conflicts checks are done at the local attorney level, and Chern testified that the local attorneys check for client conflicts among their own client databases.  No conflicts check is run by local attorneys against other local attorney's non-Upright clients.  Thus, if a local attorney has his own practice and also works for Upright, no other Upright attorney can check for conflicts against that attorney's private client database. Delafield, Tr. 195-96, 206-07, Day 2.  Chern contends that, practically, this is not a problem, since their local partner attorneys "generally speaking" do not represent creditors.  Chern, Tr. 165-66, Day 3.  The "onboarding associate," an employee in Chicago, runs conflicts checks against Upright's master database.  Chern, Tr. 166-67, Day 3.

you [sic] local attorney and they accept you as a client," and that until fees are paid in full, the firm will not take action to file the case. The oral retention agreement further advises that the client acknowledges that the firm will be performing work on the client's behalf, such as by fielding creditor calls, answering client questions, and preparing the petition. In addition, "[p]ayments made are direct compensation for that work on your case and are generally non-refundable as they are earned." UST Ex. 58. The oral retention agreement provides that an electronic retainer agreement will follow which the client is obligated to sign and return. *Id.* In the Western District of Virginia, forty-eight percent (48%) of all clients paying over time never complete their payment plans, and the cases are not filed. UST Ex. 1, p. 5. In general, the fees that are not refunded are not shared with the "local partners."

### B.  **The Local Partners**

In furtherance of its national marketing and business plan, Upright brings on local attorneys around the country as "partners," "local partners," or "limited partners." These attorneys generally have their own practices and have limited signage and advertising indicating they are affiliated with Upright. The attorneys get a different CM/ECF case filing password for their own practices, and a separate one for cases filed as an Upright partner. The local attorneys sign a limited partnership agreement that provides they have no rights in the management of the firm and only a marginal, non-voting interest in it. The attorneys are licensed in their home state.

Prior to September 2015, the senior client consultant would set up a recurring payment plan for a client to start paying his or her fee, and an engagement agreement would be generated and sent to the client. At that point, the local attorney or "limited partner" would get an email inviting the attorney to contact the client. The attorney would have forty-eight (48) hours to

contact the client and do the initial welcome call.[16]  Chern, Tr. 190-192, Day 3.  Assuming the

partner approved of the representation and did not have any modifications to the representation,

whether in terms of fees or the relief sought by the client, they confirmed the representation back

to Upright.  *Id*. at 191.[17]  At that point, Upright would take calls at the main office in Chicago.  If

they had a matter that required local participation, the client would be transferred or an email

sent to the partner to contact the client.  *Id*. at 191-92.  Once the client paid in full, Upright had a

team of "document collectors" who would "interface with the client and collect all of the

documents remotely."  *Id*. at 192.  An associate attorney on staff in Chicago would prepare an

initial draft of the petition and do an initial Skype interview with the client.  A second interview

and petition review would be scheduled with the local attorney, who would go over final changes

to the petition, make any changes or corrections, and then file the petition.  These meetings were

by Skype or in person.  The local attorney would attend the initial meeting of creditors.  *Id*.

After September 2015, the process was the same until the client paid in full.  At that point, Chern

testified Upright decided to pay the local partners more, but also shift to them the responsibility

of collecting information and preparing the petitions.  *Id*. at 192-93.  That system prevails

today.[18]  Upright, however, has at all times prepared in Chicago the Rule 2016 disclosures for

the local partners and continues to do so.  Chern, Tr. 197-98, Day 3.

     In early 2014, LSC/Upright was advertising on the internet that it had local offices

"nationwide."  However, at that time, it only had local partners in fourteen (14) states.  Chern,

with assistance of another attorney, took the lead on recruiting local partners, targeting attorneys

---

[16] The attorney is supposed to key the completion of this call into a quality control program. Chern, Tr. 139-40, Day 3.

[17] Presumably, this was also when a conflicts check was run by the local attorney.

[18] The prior system, with the petition being prepared in Chicago, was clearly susceptible to errors, as one petition was filed by Delafield as a member of Law Solutions Chicago, LLC d/b/a Jason Allen Law LLC, not Upright.  UST Ex. 20.  According to Delafield, all he could see prior to the petition being filed was the space for his name.  He could not see how the field below that was populated, yet it was still filed on his behalf under his CM/ECF password.

with approximately 20 years of experience or more in consumer bankruptcy.[19] Today, Upright

has approximately 400 partners. Chern, Tr. 135-36, Day 3. Upright used to advertise that it had

"local offices nationwide," but advertises now that it has "attorneys in offices nationwide,"

presumably to squelch any concerns that it does not have any office space actually leased

anywhere but Chicago. The local partners are conducting Upright business locally out of their

individual offices, according to Chern. Chern, Tr. 155-56, Day 3. Chern testified that Upright's

website currently states that it has "attorneys in all 50 states across the nation." Chern, Tr. 156,

Day 3. Upright holds the partners out to the public with the title, style, and attribute of "partner,"

which appears on the firm's website, letterhead, business cards, and in some cases, office

signage. Chern, Tr. 187-88, Day 3. The local partners are to take reasonable steps to apprise

potential clients of their affiliation with Upright. *Id.*

In 2014, LSC/Upright was not authorized or qualified to do business in Virginia. An

affidavit from the Virginia State Bar indicates Law Solutions Chicago, LLC is not registered

with the State Bar. However, Upright Law, LLC, a Virginia limited liability company, was

formed January 9, 2015, and Allen sent a document to the Virginia State Bar to qualify it with

the Bar that same date. However, the bar qualification document was not signed by a member of

the Virginia State Bar, as required. That deficiency was ultimately corrected, and Upright was

qualified with the Virginia State Bar effective August 12, 2015. UST Ex. 57. The Virginia State

Bar has taken no action against Upright for its tardy registration, despite beginning the provision

---

[19] Chern's testimony rings hollow and is contradicted by his December 3, 2014 email to Delafield. UST Ex. 45.
Under "[r]equirements of becoming a partner" Chern advised Upright was looking for attorneys with at least five
years' experience in both Chapter 7 and 13. Moreover, Upright's alleged vetting of its local partners appears to have
been minimal, if not non-existent. The email advises that the "requirements" include a "clean disciplinary record."
In this case, it appears that meant nothing more than a certificate of good standing from the Virginia State Bar.
Morgan and Delafield both had disciplinary histories with the Virginia State Bar before joining forces with Upright,
and Delafield has received prior instruction from this Court on the proper performance of his duties due to failures to
meet his expectations before the Court. UST Ex. 63. Morgan is also a convicted felon who was once suspended by
the Bar. Chern testified that these matters were known to Upright. UST Ex. 28, pp. 13-14.

of legal services in Virginia sometime after January 23, 2014 when it confirmed its arrangement

with Morgan to provide services out of his office in Warrenton, Virginia.  UST Ex. 41.[20]

Upright began generating revenue from Virginia clients in late January or early February 2014.

### 1.  The Partnership Agreements and "Partnership"

The UST contends that the LSC local partnership structure is nothing more than a

"bankruptcy boiler room" and "telemarketing referral business," with the Chicago office as a

"referral hub," and the partnership agreements just another way "to secure another person to

attend 341 meetings and whitewash LSC's unauthorized practice of law, while [the local

partner's] purpose was to receive additional revenue with minimum input."  UST Initial Closing

Argument ("UST Brief") at 3, 8, 15.  The testimony and exhibits were voluminous on this point,

both in terms of the UST's case and Upright's response, and the Court will attempt to summarize

and condense them.  Each local partner is required to sign a partnership agreement, which is

revised and updated periodically.  Pursuant to these agreements, local partners are entitled to a

share of the revenue generated from that local partner's clients and a bonus pool formed from

revenue generated in the local jurisdiction.  These local partners receive Schedule K-1s to report

their Upright-related income, as opposed to a Form 1099 or a W-2.  Upright provides the local

partners with access to its SalesForce software system, its case management system, so that they

can log in and work on a client's file with Chicago personnel.  They also have access to

---

[20] The VSB registration is on a form for a professional limited liability company.  The registration form discloses the
Virginia members and managers of Upright Virginia as "John Morgan, Edrie Pfeiffer, and Darren Deerfield [sic]."
Delafield's name is misspelled each time it appears.  UST Ex. 57.  Chern testified that Upright Virginia was formed
after consulting with Bernard DiMuro, LSC's Virginia ethics counsel.  Further muddying the organizational waters,
Chern testified that: "After Mr. DiMuro did his research, he could not provide with a degree of certainty a definitive
opinion to us as to what was required.  In other words, his feeling was that Virginia state law was somewhat
ambiguous as to whether or not a foreign LLC could register to practice law in Virginia.  As a result of that, out of
an abundance of caution, we thought it was prudent to go ahead and set up a Virginia professional limited liability
company called Upright Law, LLC, which is a d/b/a for Upright Law, PLLC."  Tr. 64-65, Day 3.  As previously
shown, Upright Law, LLC, an Illinois limited liability company, is a d/b/a of LSC.  Upright Law, PLLC does not
appear in LSC's 2016 federal tax return as a company owned or controlled by LSC.  Despite their separate
existences, the separate Upright entities are practically referred to and treated by the Chicago managers as a single
entity.

Upright's Best Case bankruptcy software system and an Upright credit card for the payment of filing fees.  Upright also provides the local partners with malpractice insurance.  Chern, Tr. 182-88, Day 3.[21]

The partnership agreements outline the allocation of certain rights and responsibilities between Chicago and the local partner, including the financial compensation, and Section 24 of the partnership agreement states that limited partners have "no right to participate in the management of the Firm."  *See e.g.*, UST Ex. 43, Upright Ex. D8, Morgan Agreement, ¶ 24. From 2014 to March 2016, Virginia residents were given fee agreements which provided that money paid to LSC was earned on receipt.  Chern contended, however, such language was not intended to restrict or curtail the limited partners in performance of the ethical duties or abilities to provide input into the firm's operations.  During that same time frame, attorney's fees were placed directly into either LSC's Illinois general operating account or LSC's Virginia operating account.

Limited/local partners are invited to attend bi-monthly "partner's meetings" by teleconference during which Chern solicits feedback about firm operations.  In addition, during months when there is no partnership conference, Chern convenes a telephone conference of the Virginia limited partners so they have direct access to him.  Chern, Tr. 183-85, Day 3.  There is also an annual partnership meeting in Chicago that limited partners are invited to attend, as well as a partner newsletter that goes out periodically.

## 2.  <u>Local Partner John C. Morgan, Jr.</u>

Morgan is a member of the Virginia State Bar, with his office in Warrenton, Virginia.  He is admitted to practice in the United States Bankruptcy Courts for the Eastern and Western

---

[21] LSC pays agency fees to Mighty Legal for use of the Best Case software.

Districts of Virginia.  He has been disciplined twice by the Virginia State Bar, once for

contacting the represented client of another attorney in a criminal matter, and the second time for

the commission of a felony.  He was suspended by the Bar for three years for the second matter.

UST Ex. 24, Tr. pp. 126-27.[22]  Morgan obtained electronic filing privileges in this Court in 2005

and has engaged primarily in consumer bankruptcy cases in this Court since then.

In early to mid-January 2014, Chern approached Morgan about joining Upright and

establishing a Virginia presence.  Prior to Morgan joining Upright, Upright had no presence in

Virginia.  Morgan took notes of his initial conversation with Chern.  The notes reflect that

"Kevin Chern and Ed Scanlon [sic] have started a new national law firm."  UST Ex. 72.  Among

other things, the duties of the local partner were to do a 10-15 minute compliance call within 24 -

48 hours, the firm would take client calls and creditor calls, presumably at "headquarters" in

Chicago.  The firm would prepare the petition.  Morgan would be required to obtain a separate

ECF login for these cases and handle the petition signing and the Section 341 meeting of

creditors.  Chapter 7 cases are said to have a "25% margin" and Chapter 13 cases have a "40%

margin."[23]  *Id.*   Morgan subsequently applied for and obtained a new ECF filing login for

"UpRight Law LLC" on October 9, 2014.  UST Ex. 50.  He filed his first case in this Court for

Upright on October 29, 2014.[24]  Overall, at least nine (9) cases have been filed under Morgan's

Upright ECF password – mainly Chapter 7 cases with one under Chapter 13.  Stip. ¶ 17.

---

[22] The Court takes judicial notice of the length of the suspension in the Bar's order of suspension.
http://www.vsb.org/disciplinary_orders/morgan_opinion.html.
[23] Chern followed up with an email dated January 15, 2014.  UST Ex. 41.  The email provided, in part, that "[a]s a
partner of the firm you will receive the following compensation: 1. Chapter 7 – 8% of the gross fee for the retention,
plus 17% of the gross fee for filing the case under the ECF you obtain for Firm filings and for attending the 341
meeting and making sure the debtor's case is completed.  2. Chapter 13 – 10% of the gross fee for the retention, plus
30% of the gross fee for filing the case under the ECF you obtain for Firm filings and for attending the 341 meeting
and making sure the debtor's case is confirmed, plus 40% of any supplemental fees attributable to post-confirmation
work.  3. Pro rata share of a pool of 10% of any revenue generated from ancillary services including litigation on
FDCPA and FCRA matters the firm generates. 4. 1% pro rata non-voting profit share with other state members of all
law firm business transacted in the state." *Id.*
[24] As the UST points out, Upright was not qualified to do business in Virginia or registered with the Virginia State
Bar at this time.

Morgan's 2016 K-1 from LSC reflected $18,620.00 in self-employment earnings from LSC.

Upright Ex. P5, pp. 85-86.[25]

### 3.  **Local Partner Darren T. Delafield**

Delafield has long appeared before this Court, and the Court is well familiar that his

practice consists primarily of representing consumer debtors in Chapter 7 and Chapter 13 cases.

Delafield first obtained ECF filing privileges in this Court in October 2004.  As mentioned

above, he has received prior admonition from this Court with instructions as to the future

handling of cases, as well as a private reprimand from the Virginia State Bar.  UST Ex. 63.

In early December 2014, Chern solicited Delafield to become a local partner of Upright.

On December 3, 2014, Chern sent Delafield a pitch email, which provided, in part, as follows:

> Our goal at UpRight is to improve people's lives by providing the highest quality
> services, most effective legal strategies and world class customer service.  I firmly
> believe that the only way to accomplish that end is to leverage both our incredible
> systems, technology and operations at our headquarters in Chicago and the intense
> subject matter expertise of local practitioners like you. We strive to be America's
> premier virtual consumer law firm that is geographically agnostic, representing
> clients in both rural and metropolitan areas, and allowing consumers to interact
> with their lawyer online, the same way they transact business with their banks and
> other professionals.

UST Ex. 45.[26]  Delafield signed a partnership agreement with LSC/Upright shortly thereafter.

UST Ex. 46.

---

[25] Upright Ex. P5 is LSC's 2016 Federal Tax Return, which is currently under seal.  Redacted versions of the K-1's
of Morgan and Delafield will be unsealed.  The remainder of the return will remain under seal, absent further order
of the Court.  While the Court sees no need to disclose the total gross revenues of LSC as reflected on the return,
they are substantial. The Court further notes that through June 30, 2017, Upright had filed 190 cases in the Western
District of Virginia, and it had received payments from 757 people (joint representation of spouses is treated as one
person). Total fees paid to Upright, including filing fees, were $821,156.52 in this district.  Total fees paid in cases
actually filed equaled $409,650.22, including filing fees, all through June 30, 2017.  UST Ex. 1, p. 5.
[26] The January 2015 Chern email also reflected the change in compensation from 2014, providing that the new
compensation structure was as follows: "1. Chapter 7 – 25% of the gross fee.  2. Chapter 13 – 40% of the gross 'no
look' fee, plus 40% of any supplemental fees attributable to post-confirmation work. 3. Pro rata share of a pool of
10% of any revenue generated from ancillary services including litigation on FDCPA and FCRA matters the firm
generates. 4. 1% pro rata non-voting profit share with other state members of all law firm business transacted in the
state."  UST Ex. 45.

Delafield applied for an ECF login for "UpRight Law LLC" by application dated January 9, 2015, which was promptly issued.  He filed his first Upright case in this Court on January 10, 2015.  In total, more than thirty (30) cases have been filed by Upright in this Court though Delafield's login, with seven (7) cases having been filed before Upright was properly registered with the Virginia State Bar.  Stip. ¶ 19.[27]  Delafield's 2016 K-1 from LSC reflected $21,741.00 in self-employment earnings from LSC.  Upright Ex. P5, pp. 189-90.

## C.  **The "New Car Custody Program" or "Sperro Program"**

Chern testified he met an individual named Brian Fenner ("Fenner") as a result of both having attended the National Association of Consumer Bankruptcy Attorneys annual conference in Chicago in 2015.  Fenner was a sponsor and exhibitor, and he obtained Chern's name off a list of attendees.  Prior to 2015, Fenner had long experience in the repossession industry.  Fenner owned and ran multiple companies, including Collateral Services of Indiana, LLC, Sperro, LLC, and Fenner & Associates, LLC.

Chern testified that Fenner described a service he provided called the "New Car Custody Program" or the "Sperro Program."  As described by Chern, Fenner pitched this program as a service to consumer debtors who wanted to surrender their car in bankruptcy.  Fenner explained that his service facilitated the return of collateral to the auto finance company by having the debtor turn the car over to Fenner, and Fenner would in turn notify the finance company that he has the car, and if desired, he would return the car to the finance company.  Chern contends that

---

[27] From October 24, 2014 to September 30, 2015, Delafield was affiliated with another high volume consumer bankruptcy law firm, known generally as "Prince Law," that was based in Florida, advertised over the internet, and referred prospects to a local "member" for filing.  Prince Law and a different local member were held in civil contempt and barred from filing cases in this Court after the Court found they engaged in a variety of ethical and rule violations.  *See In re Futreal*, No. 15-70886, 2016 WL 2609644 (Bankr. W.D. Va. May 5, 2016), and *In re Futreal,* 2016 Bankr. LEXIS 3974.  Curiously, the Court recognizes Edrie Pfeiffer, footnote 20, as another Virginia based Prince Law alumni now affiliated with Upright.

Fenner advised him that Fenner would give the finance company the option of using Fenner's auction services, or they could pick the car up from Fenner.

Chern testified Fenner's program interested him because Fenner offered to pay the legal fees for consumers who were interested in participating in it.[28]  As is the case in many bankruptcy cases, clients struggle to come up with the fees to pay their attorneys, as well as filing fees.  One of the benefits of the program gleaned from Chern's testimony was that this would enable a consumer debtor who wanted to surrender his or her vehicle to have the attorney's fees paid by a third party such that the debtor did not have to go out of pocket, and it would eliminate the delay in filing precipitated by an installment payment plan that a debtor may or may not complete.

In May 2015, Chern told Fenner he would ask Leibowitz to contact Fenner and investigate the "risks/rewards" of participating in Fenner's program.  Leibowitz did that, although he testified he only reviewed the "risks," and Chern advised Fenner that they would be moving forward.  On May 11, 2015, Fenner emailed Chern, after being told he passed the "smell test," stating as follows:

> Wonderful, attached is a copy of our standard towing and storage agreement. Please advise if there is anything you would like changed. Depending on the region where the collateral is picked up, the only change we make is the lot location where the collateral is stored.  *That being either Nevada, Mississippi, or Indiana.*

UST Ex. 35-10 (emphasis added).

---

[28] Before Fenner made his pitch, Chern testified he had heard of a "vehicle recovery program" being run by an attorney named Max Gardiner while attending a "bankruptcy boot camp" run by Gardiner in North Carolina.  Chern testified that through Gardiner's boot camp, he also met other lawyers who had vehicle recovery programs.  Chern testified he thought, "hey, there are other lawyers who are doing this legitimately in other parts of the country.  This is something that I should seriously consider."  Chern, Tr. 81-82, Day 3.  Chern acknowledged that the Sperro Program was unlike the Gardiner program, in that Gardiner did not tow cars out of state and he gave lenders a date in the future after which charges would start to accrue if the vehicle was not picked up.  Chern, Tr. 15-16, Day 4.

This was the beginning of a scam.

Fenner sent another email to Chern on May 12, 2015, advising of their hookup fees, towing rates, and impound fees.  Fenner advised Chern as follows:

> To perfect our lien process, we hold the car for 30 days. This is a state statute. At the 31st day the account would be in default status.  This will generate the lien process.  We then send both the consumer and the lien holder notification by certified letter via US post office. We follow the lien process accordingly to witch [sic] state we are storing the collateral. At this time, the lien holder will make their choice on how they wish to move forward.

> I believe that if you put in the BK petition that Fenner & Associates paid for the BK and that the collateral is stored at Collateral Services of Indiana LLC with our address, collaterals [sic] location. This should be more than enough notification to the lien holder and the court the intent, location and status of the collateral.

> We have to hold the vehicle so many days before we can perfect our lien by state law.  We also need some time to generate a profit margin. I would prefer not to send notification to the lien holder from the existing attorney up front. The Lien holder would already be notified in the petition. Any attempts to speed the process would eliminate our perfection of the lien as well as cutting our profit.

UST Ex. 35-18.

On May 18, 2015, Chern asked Fenner for a copy of any correspondence that other attorneys in his program used to notify lenders that the collateral was in Sperro's possession, along with a copy of a petition to show how the compensation was disclosed to the bankruptcy court.  UST Ex. 35-30.  Fenner replied that no other attorneys sent such correspondence to creditors and advised that the entity paying the fees should be disclosed as Fenner & Associates. *Id*.  Fenner also asked that letters not go out to creditors until at least five days passed from pick up, in order to give the collateral time to reach his storage facility in Indiana.  *Id.*

On June 18, 2015, Chern sent an email to all Upright partners advising "New Car Custody Program at UpRight Law – Read Carefully."  UST Ex. 35-53.  Fenner was blind copied on the email.  In that email, Chern advised his limited partners that Upright's senior client

consultants had started offering a new program to clients to surrender a vehicle to a towing and

storage facility and have the cost of their bankruptcy case fully subsidized.  In order to qualify,

Chern advised that the following conditions needed to be met:  (i) the client wanted to file

Chapter 7, (ii) the client has a vehicle he or she is willing to surrender, (iii) there is no equity in

the vehicle, and (iv) the vehicle is worth greater than $5,000.00.  *Id.*  The client is advised to

contact Fenner's company "Sperro," and to arrange for Sperro to take custody of the vehicle.  At

the time of surrender to Sperro, the client signs a towing, storage and custody agreement with

Sperro whereby the client contracts with Sperro to load the vehicle, tow it to a facility, store and

maintain it until such time as the finance company picks up the vehicle.  *Id.*  Chern advised his

colleagues that Sperro charges "customary and reasonable fees for these services (e.g. $75

loading fee, $1.50 per mile towing, $45/day storage, etc.)."  *Id.*  Chern advised that Upright – not

Fenner – notices the finance company by certified mail "within a couple of days that Sperro has

custody of the vehicle, the location of the storage facility, contact information for Sperro and

instructions that they should recover the vehicle as soon as possible to avoid excessive storage

fees."  *Id.*

       The benefits to the clients were also described.  Chern told his local partners that the

client can immediately cancel the insurance.  The client no longer has to maintain it or worry

about the expense or inconvenience of plating or storing a vehicle.  The client does not have to

worry about the repossession agent showing up at home or at work.  The creditor can be referred

to Sperro as to the status of the vehicle.  The client does not have to worry about finance

companies who refuse to pick up a vehicle, and "[i]mmediately upon placing the vehicle in

Sperro's custody, Sperro will remit the entire legal fee plus filing fee to UpRight Law on client's behalf." *Id.*[29]

An Upright limited partner named Mark Steinberg in Miami, Florida immediately questioned the program after it was rolled out, and on June 18, 2015, Chern told Steinberg as follows: "[t]hey hold the car in one of three states that allow for mechanic's liens that trump the 1st lien. 60% of the time, they pick up the car and satisfy the charges. 40% of the time they just abandon the vehicle. Sperro really makes its money when the finance company abandons and Sperro auctions it off." UST Ex. 35-55.[30] So, at least as early as June 18, 2015, Upright senior management knew that Fenner and his companies were towing cars out of states like Florida (and as will ultimately be seen, Virginia) to Fenner-related storage lots in Nevada, Mississippi, or Indiana for the purpose of trying to prime secured lenders, or hold their collateral hostage, with excessive hookup, towing and storage fees that were completely unnecessary. But, Fenner and Sperro were willing to pay Upright's clients' attorney's fees and filing fees in order to get the referral from Upright to do it. Also significant to the Court is that all of this was offered to prospective clients by Upright using "senior client consultants" without the clients ever having spoken to their local attorney before being placed into the program,[31] and Chern was negotiating with Fenner for Sperro "to pay our marketing company $150 for each deal we generate from

[29] The June 18, 2015 email stated, under "Due Diligence," that "Kevin Chern reviewed the program in detail with Felicia Burda, our UST Counsel, Mary Robinson, or [sic] Professional Responsibility Counsel, and David Leibowitz, General Counsel of UpRight Law and Head of Litigation." UST Ex. 35-53. Chern testified Ms. Burda was a former attorney with the U.S. Trustee's Office, and that Ms. Robinson was a former disciplinary attorney with the State of Illinois. Chern, Tr. 76-77, Day 3.

[30] Steinberg's response was, in part, "I guess it just seems like it is cheating the unsecured [sic] creditor. And I need to add that it pains me to type that sentence because I have a general disdain for most of my clients' creditors. But you have clearly presented the scenerio [sic] to people who are well positioned to give a recommendation, so I am not going to object." *Id.*

[31] Regina White, a former Upright client, who was ultimately represented by Delafield outside of the Upright relationship, participated in the Sperro Program before being dropped by Upright as a client. White testified that she "kept asking them are you sure this is legitimate because I don't want to go to jail. . . . But you know, they assured me it was legal and legitimate and I trusted them to know what they were talking about." White, Tr. 241-42, Day 1.

partners . . . ." UST Ex. 35-54, a June 18, 2015 email from Chern to Fenner.[32]   As will be seen

below, Chern further authorized the dissemination of letters to finance companies over the names

of Upright's local partners from the Chicago office, and listing the local attorney's addresses as

Chicago, without the knowledge of some of those attorneys.

Chern testified that he decided to terminate Upright's participation in the New Car

Custody Program on or about November 19, 2015 due to a variety of factors, one of which was

Chern learning from one of his limited partners that a lawsuit was filed by Ally Financial against

Sperro and others alleging that the defendants in that case were complicit in converting its

collateral.  At that point, after reviewing the allegations in Ally's complaint, Chern decided that

Upright should not refer any more clients to Sperro until the court ruled in that litigation.  Chern,

Tr. 86, 104-05, Day 3.  In October, Chern was also getting concerned with Fenner and Sperro

becoming increasingly tardy with the payment of Upright's attorney's fees, even though they had

picked up client vehicles.  *Id*. at 105-06.  Finance companies also started complaining to Upright

about Sperro's excessive towing and storage fees.  *Id.* at 107-08.

### D.   Debtors Timothy and Andrian Williams

Timothy and Andrian Williams are "assisted persons" who filed a Chapter 7 bankruptcy

petition in this Court on December 22, 2015.[33]  Stip. ¶ 28.  They are husband and wife, residing

in Smyth County, Virginia.[34]   In August 2015, the Williamses were experiencing financial

trouble, and Ms. Williams began searching the internet for bankruptcy options.  In a search,

Upright Law came up, and she filled out an online information request form.  Her husband was

---

[32] It is unclear to the Court who "our" is in this email, but it appears to be one of the entities Chern and Scanlan own together, as opposed to LSC/Upright.  It is also not clear whether these funds were ever paid, but the effort was clearly made by Chern to squeeze what he could out of the Sperro Program.

[33] Mrs. Williams' legal name is "Andrian," not "Adrian," which caused some confusion in the proper filing of her petition.

[34] Both Mr. and Mrs. Williams testified at trial, and both were earnest, forthcoming, and credible witnesses. They were, unfortunately, caught in the crossfire between the UST and Upright through no demonstrable fault of their own.

contacted by an Upright representative by telephone later the same day. The calls between Upright and their prospective clients were recorded, including the calls with the Williamses. The Williamses spoke to Upright, in part, because other attorneys they had spoken to in the past would not assist them unless they had money to pay their fees. Williams, Tr. 97-98, Day 1.

The Williamses advised Upright they were being called by various creditors, in particular, GCB Acceptance Corp. ("GCB"), the secured lender on their Ford Taurus. Ms. Williams was becoming stressed about the calls. Mr. Williams spoke with Upright's client consultants and he was informed Delafield would be his local attorney. The total attorney's fees and filing fee quoted were $1,985.00. The Williamses wanted to return the Ford Taurus to GCB, but GCB only offered refinancing even though they were seriously delinquent. After going through their financial situation with a client consultant named Alexis Ball, Mr. Williams was told "you seem like the perfect candidate for filing for bankruptcy. We definitely want to help you get your financial independence back. . . . And I think filing bankruptcy would help you do that." Stip. ¶ 29, UST Ex. 3-1, Tr. p. 11-12.

Mr. Williams had inquired about continuing to pay on several payday loans, and Upright's non-attorney consultant advised him "it's going to be up to the trustee whether or not they're going to include those into the bankruptcy . . . ." UST Ex. 3-1, Tr. p. 21. Later, when told by a senior client consultant that his credit score would go up by 85 to 135 points after he filed bankruptcy, Mr. Williams apparently decided to include the payday credit loans, stating that "I mean, now that I know that . . . filing bankruptcy is going to help my credit, yeah." *Id.* at 35, 40. The senior client consultant then advised "it just makes sense to just get rid of everything . . . if you continue to hold on to that and you miss a payment, it's going to ruin your credit while we're trying to build it for you . . . ." *Id.* at 40.

Once the Williamses mentioned their issues with the Taurus, one of Upright's senior client consultants brought up the Sperro Program as a way to get GCB dealt with and to have their attorney's fees and filing fee paid at the same time.  The Williamses, before they ever had a chance to consult with their local attorney, were asked to call Sperro directly and talk to them about surrendering their car and having their attorney's fees and filing fee paid.  Once Sperro sold the car, and their fees were paid, the Williamses would be refunded any fees they had paid toward Upright in the interim.[35]  In one conversation with senior client consultant Angelo Walsh at Upright, Mr. Williams advised he was being contacted by GCB about the car and indicated that GCB advised they would pick it up if a payment was not made.  Walsh, in turn, reminded Mr. Williams that Sperro would be contacting him to pick up the car, and that if he turned it over to GCB he would likely get nothing for it.  Walsh advised Mr. Williams, that although it was up to him, "in this situation, if I were you, I would keep it hidden and we come get it, and at least pay off some of your bankruptcy . . . ."  UST Ex. 3-1, Tr. pp. 75-76.

Mr. Williams questioned the legality of the Sperro Program with a non-Virginia licensed Upright attorney named Ryan Galloway.  Mr. Galloway told Mr. Williams the Sperro Program was legal.  Stip. ¶ 32.  Mr. Williams later spoke with an Upright onboarding attorney named Jacob Brown, and Brown explained the Sperro program was like parking a car in a fire lane.  The car gets towed to a lot, then the finance company has to pay the towing company and lot owner to get it back.  "And so that's like where Sperro makes all their money," Brown told Mr. Williams.  UST Ex. 3-1, Tr. pp. 87-88.  "So, it's totally fine . . . ," Brown said.  *Id.*  At no time in the recorded call transcripts does it appear that any Upright personnel told the Williamses the cars were being towed out of state.

---

[35] Upright sought an immediate credit card payment to confirm the representation.  UST Ex. 3-1, Tr. pp. 33, 47-48.

Sperro sent the Williamses a transportation and storage agreement, and the Williamses signed an agreement with Sperro. Sperro had the vehicle picked up and transported it from the Williamses' residence in Smyth County, Virginia to Sperro's facility in Indianapolis, Indiana. The security agreement between the Williamses and GCB provided that the Williamses agreed, among other things, "not to sell, encumber or abandon the Collateral," and "not to remove or attempt to remove said collateral from the county and state given above as my address without notifying you in writing . . . ." Stip. ¶ 37.

Upright then emailed Delafield to approve the representation. On September 1, 2015, Delafield spoke with the Williamses and confirmed his representation to them as an Upright partner for their Chapter 7 bankruptcy case. However, on September 4, 2015, without ever having spoken to Delafield, Sperro picked up the Ford Taurus and towed it away. Sperro sold the car at auction on or about October 9, 2015. Stip. ¶ z. On September 8, 2015, someone at Upright mailed a letter to "General Acceptance Corporation" in Greenville, North Carolina, supposedly the lender for the Taurus, when the actual lender was GCB in Johnson City, Tennessee. UST Exs. 3-7, 3-9.[36] The letter advised the lender, albeit the wrong one, that, after identifying the Williamses, the collateral, and VIN on the Taurus,

> You are hereby notified that on September 1st, 2015 my client placed the above-captioned collateral, upon which you allege to hold a security interest, into the custody of Sperro Towing and Recovery, located at 2534 Bluff Road, Indianapolis, Indiana 46225. Please contact Sperro to arrange to recover the vehicle . . . . To avoid unnecessary storage and maintenance fees, please contact them immediately.

---

[36] This was not a one-time event. On September 15, 2015, Upright sent a virtually identical letter, this one to "Ally," regarding a Delafield client named Shannon Chapman. UST Ex. 64. A template document was admitted by which Upright could plug in any local partner's name. UST Ex. 35-29.

UST Ex. 3-7. A telephone number was provided. The letter was closed by the signature line

Darren Delafield, 79 W Monroe, 5th Floor, Chicago, IL 60603. Delafield neither saw nor

authorized this letter before it went out.[37]

On September 21, 2015, LSC deposited a $1,650.00 check from Fenner & Associates

into LSC's operating account and deposited a $335.00 check from Fenner & Associates into an

IOLTA account. Stip. ¶ 38. The October 16, 2015 engagement agreement with Upright

described the fees charged to the Williamses as "Attorney's fees: $1600.00; Court Filing Fees:

$335.00; and Report Fees: $50.00. Total Fees, $1985.00." Stip. ¶ 39. The Rule 2016 disclosure

reflected the attorney's fees were paid by "Sperro." UST Ex. 3-15, p. 92. The Williamses met

with Delafield several times by Skype and their petition was ultimately filed on December 22,

2015.

The Sperro Program came to light at the Williamses' 341 meeting, and Delafield denied

knowing why Sperro paid the Williamses' fees in connection with their case. Stip. ¶ 40.

However, Delafield admitted at trial he knew as early as December 2015, as the Williamses had

told him, that the car had been used to pay their fees. Delafield, Tr. 143-44, Day 2. Delafield

also admitted in his Answer to the Complaint that he received the June 18, 2015 email about the

New Car Custody Program from Chern. UST Ex. 3-33; Delafield, Tr. 142-43, Day 2. At the 341

meeting, Delafield attempted to deflect any questions regarding Sperro by the Trustee and

GCB's counsel to an unidentified "senior attorney" at Upright for further explanation, professing

ignorance as to the relationship between Sperro and Upright. UST Ex. 3-2. The Chapter 7

---

[37]Chern's explanation as to the letters sent out over Delafield's name without his knowledge or permission
referenced back to the June 18, 2015 roll out email for the Sperro Program. "So, I believed, at the time, that my
June 18th memo to my partners notified the [sic] that we were going to be sending a letter out to the finance
companies notifying them that Sperro was in custody of the vehicle, notifying them to pick up the vehicle, you
know, quickly to avoid excessive charges, etcetera. It didn't have Mr. Delafield's signature on it. It has his name on
it as the attorney who was going to be representing the debtor throughout Upright Law. I regret that I didn't do a
better job of communicating to the partners that their names would be placed on those letters. That was a mistake on
my part." Chern, Tr. 110-11, Day 3.

Trustee referred the matter to the UST, and a motion for a Rule 2004 examination was filed and granted by Order on March 15, 2016.[38]  Treating joint debtors as a single client, not less than 219 clients of LSC participated in the Sperro Program, of which 7 resided in the Western District of Virginia.  UST Ex. 62; Stip. ¶ 27.  Nationally, Upright generated not less than $333,545.00 in fees from the Sperro Program, exclusive of filing fees, before it was terminated.  Tr. 340-44, Day 2.

### E.  **Debtor Jessica Dawn Scott**

Jessica Dawn Scott ("Scott") is an "assisted person" who filed a Chapter 7 petition with this Court on February 24, 2016.  Stip. ¶ 41.  Scott first learned of Upright through an internet search and understood it to be a law firm based in Chicago with partnerships throughout the United States.  Scott searched the internet, and Upright came up early in her search.  Like the Williamses, Scott told Upright that she was interested in surrendering a car, and Upright told her about the Sperro Program.  Scott spoke with Brandon Fox, an Upright senior client consultant, on October 14, 2015.  When asked if she knew what Chapter she wanted to file, Scott said "Whichever wipes out everything."  Fox replied:  "Okay.  So Chapter 7 definitely."  UST Ex. 4-1, Tr. p. 13.  Scott had a 2005 Pontiac Sunfire she wanted to surrender financed with Credit Acceptance Corporation.  Regarding the Sperro Program, Fox explained,

> "… so it's a partnership that we have with a repossession company.  So they work out a deal with the bank . . . they come and pick up the vehicle.  Now rather than you having a repossession sitting on your – on your record, we're going to file a bankruptcy. So any debt that you have is removed off of your record. . . . And whatever the balance is of that vehicle that we get, the check, we refund you all of that money back.

---

[38] On March 14, 2016, Chern emailed Delafield and advised "Please set up a time for the client to be prepped by you and me in advance of the hearing and advise him not to talk to anyone until then about the circumstances surrounding the placement of the car with Sperro."  UST Ex. 3-18.

UST Ex. 4-1, Tr. pp. 13-14. Later, on October 19, 2015, Scott spoke to Fox again and inquired

about a debt she had co-signed with her ex-spouse. The exchange went as follows:

> Scott: . . . like my ex and I have a loan together. Like what happens with that?
> Fox: Okay. So if you're both on a loan, you'll be taken off of all responsibility of
> the loan and he'll be fully responsible.
> Scott: Oh, God, that sucks.
> Fox: Now if you want to keep that loan though, we can keep it off and you can
> continue to pay on it . . . .
> Scott: But I still don't want to screw him over.
> Fox: Okay. Well I mean, we can leave that off, that's not a problem.

UST Ex. 4-1, Tr. pp. 30-31.

On October 20, 2015, Scott executed an engagement agreement with Upright. Scott's fee

agreement stated that the total fee for her bankruptcy, including filing fees, was $1,835.00. Scott

made a $100.00 payment to LSC as a partial payment toward its attorney's fees. On or about

October 24, 2015, Scott spoke to Morgan over the telephone for an initial consultation and he

approved her as a client. The first time Morgan ever met with Scott in person was when she was

deposed in this case, although he did talk to her over the telephone. Scott met with Morgan's

wife, Rhonda, who is his assistant in his law practice.[39] She is not an attorney. Morgan did not

review Scott's petition or schedules with Scott, and Morgan did not witness Scott sign them

either. This was delegated entirely to Rhonda Morgan.[40] The filings with the Court were replete

with errors, including (1) the Rule 2016 disclosure failed to reflect the proper amount of fees

paid to Upright, (2) the Rule 2016 disclosure failed to reflect that the fees were paid by Sperro

and/or Fenner & Associates, (3) the Statement of Financial Affairs indicated that the 2005

---

[39] Morgan's deposition testimony was frank: "Q. Who sat down physically and reviewed these petition and schedules with Jessica Scott? A: [Morgan] My wife, Rhonda. Q. So, you did not review the petition and schedules with the debtor, correct? A. [Morgan]: Not with the debtor, correct." UST Ex. 24, Tr. pp. 49-50.

[40] As a witness, the Court found Morgan to be defiant, unremorseful and wholly lacking in credibility. When questioned by the Court why Morgan and his associate attorney allow his wife to go over petitions and schedules with consumer debtors, and also obtain their signatures, Morgan testified: "Between the three of us, I would say that my wife has a superior knowledge of the law and the conduct of the signing and the elements of the bankruptcy petition. We often ask for her advice." Morgan, Tr. 66, Day 4.

Pontiac Sunfire was "attached, seized, or levied," and (4) the Statement of Financial Affairs

indicated that she transferred no property to anyone within the two years of filing bankruptcy.

UST Ex. 4-10.

A former associate in Morgan's firm named James McMinn, who had no relationship to

Upright other than working for Morgan in his separate private practice, attended the 341

meeting, and as in the Williamses' case, the Sperro Program came to light when questions were

raised about what happened to the Sunfire and who paid the attorney's fees.  Morgan said he had

Scott's permission to have someone else appear on his behalf, but he has no confirmation of that

fact.  His own time records reflect he attended the 341 meeting, when clearly he did not.  UST

Exs. 4-3, 24, Tr. p. 95.

Scott's security agreement with Credit Acceptance on the Sunfire provided in part as

follows:

> You promise that you will not remove the vehicle from the United States or
> Canada. You will not sell, rent, lease or otherwise transfer any interest in the
> vehicle or this contract without our written permission. You will not expose the
> vehicle to misuse or confiscation.  You will not permit any other lien or security
> interest to be placed on the vehicle.

Stip. ¶ 45.  Sperro towed the Sunfire from Virginia to Indiana, and by letter dated November 9,

2015, Sperro appears to have advised "Lien Holder" that Scott's car was towed to Indiana, and

that "reasonable fees [are] still due and owing at this time in the amount of $3,258.80 for the

towing, storage and related service expenses for the Vehicle . . . ."  UST Ex. 4-2, p. 7.  The lien

holder was advised that if the foregoing charges were not paid in 15 days, the vehicle would be

sold at public auction in Indiana on November 28, 2015 in furtherance of its mechanic's lien

under Indiana law.  *Id.*[41]  On November 17, 2015, Fenner & Associates paid Upright $1,650.00

---

[41] The address to which this letter was mailed, if it was mailed, is unclear.  Brian Fenner was never deposed in
connection with this litigation.  What the car actually sold for, when, and to whom are unknown.

for Scott's attorney's fees plus $335.00 for the filing fee. Morgan's initial Rule 2016 disclosure filed with the Court reflected that Scott paid Upright $1,500.00 plus $335.00 for the filing fee. UST Ex. 4-10, p. 50. There was no reference to Sperro having paid any fees in that document.

McMinn discussed Scott's meeting of creditors, held on March 23, 2016, with Morgan when he returned to the office. More than two months passed before Morgan attempted to correct Scott's schedules, statements, and other papers filed in connection with the case. Stip. ¶ 53. On June 7, 2016, Morgan filed an amended Rule 2016 disclosure, and he also filed an amended Statement of Financial Affairs ("SOFA"), which purports to bear Scott's signature under oath. Scott did not sign it and she did not know about it until she was deposed. In that SOFA, Morgan inserted that Sperro, LLC paid Upright Law LLC an attorney's fee of $1,650.00 and the filing fee of $335.00. Stip. ¶ 55, UST Ex. 4-11, 4-12. The amended SOFA does not disclose any of the funds LSC drafted from Scott's checking account, nor does it reflect that Sperro picked up the Sunfire. *Id.* Scott ultimately received a Chapter 7 discharge on July 1, 2016.

### F.  **Assertion of the Attorney Client Privilege in Discovery**

The Williamses and Scott are not parties to this litigation. There is no assertion by the UST that they did anything wrong, and there never has been. The Court finds both the Williamses and Ms. Scott to be caught up in this dispute through no fault of their own. None of the Debtors appears to have done anything more than seek out help due to severe financial distress, and rely on whoever was advising them what to do, be it an Upright sales person in Chicago or their local attorney. They did not know where else to turn, and it is truly unfortunate they have been drawn into this maelstrom.

As part of the preparation for trial, subpoenas were served on the Williamses and on Scott by the UST.  Discovery had previously been served on one or more of the Upright Defendants earlier in the case in which the attorney-client privilege was raised – not between Upright and its litigation counsel, but between the Upright Defendants and their bankruptcy clients.  May 9, 2017 Transcript at pp. 4-5 (docket no. 76).  According to counsel for the UST at a hearing on May 9, 2017, counsel for the litigants in this case agreed that since the Upright Defendants' counsel was not comfortable about asking the bankruptcy clients if they wanted to waive the attorney-client privilege, it was agreed that the UST would send Rule 45 subpoenas to the bankruptcy clients, and if those clients wanted to assert the attorney-client privilege, they could do so in response to those subpoenas.  *Id*.  Counsel for the Upright Defendants did not dispute this agreement.

Scott was served with the subpoena on April 10, 2017, and she produced documents to the UST on April 26, 2017.  However, on April 27, 2017, with counsel for the Upright Defendants having represented they were uncomfortable discussing the attorney-client privilege with the bankruptcy clients, objections to the Scott subpoena asserting the attorney-client privilege were served on the UST by Morgan.  This objection, however, was prepared behind the scenes by an attorney named David Menditto ("Menditto"), Upright's in-house litigation counsel.[42]  Menditto apparently "mistakenly" put Morgan's name on the subpoena objection.

In addition, despite his own employer's actions being at issue, Upright, through Menditto, used heavy handed tactics, including text messages, to try and get the Williamses to sign conflict waivers, even though the UST informed the Court that Mr. Williams called the UST on April 27,

---

[42] Menditto attempted to appear *pro hac vice* on behalf of the Williamses and Scott at the May 9, 2017 hearing on the UST's motion to compel.  The UST objected, and the Court sustained that objection.  At the hearing on May 9, 2017, counsel for the Upright Defendants stated ". . . Mr. Menditto was brought in to assist in responding to the subpoenas . . . ."  May 9, 2017 Tr. at p. 28.  However, when pressed by the Court, counsel could not say who brought him in.

2017 and advised he did not want to sign one.  UST Ex. 3-20; May 9, 2017 Tr. at 17.  Menditto

sent the Williamses a conflict waiver letter dated April 20, 2017, which suggested, among other

things, that the Williamses' discharge might be at issue, despite telling them later by text

message there was no allegation they did wrong.  Compare UST Ex. 3-19 with UST Ex. 3-20, p.

11.  While there is a suggestion that they could receive advice from other counsel, the proposed

conflict letter was heavily tilted toward having the Williamses waive any conflicts and let

Upright continue to represent them.  Upright had to know, as a practical matter, the Williamses

had limited resources to hire separate counsel.

> Mr. Williams emailed Menditto on April 26, 2017, stating that:

>> So, right now, I trust no one.  I was told by "my lawyer" that if I did not sign
>> the waiver that he would be solely looking out for himself only. He actually came
>> out and said, "I will say what I have to, to save myself." [Referring to Darren
>> Delafield]. . . . I don't want to be defended by anyone like that, nor anyone who
>> employs or goes into partnership with someone like that.  If he is like that, then no
>> wonder we are in the situation we are in with this case.  We followed horrible
>> advice when knowing nothing of legal matters.  We were 21 and 20 when this
>> started!  I hope and pray that noone [sic] else comes to your firm for help.  I don't
>> believe that there is anyone at the firm or your partners that are truly in it to help
>> people get out of financial trouble, but instead create more and at the same time,
>> make money yourselves. Whether it is legal or not. *I am done speaking.*[43]

UST Ex. 3-20, pp. 3-4 (emphasis added).  Nevertheless, Menditto continued to persist in trying

to get Mr. Williams to talk to him, clearly to lobby him to sign the conflict waiver so he could

assert the attorney-client privilege on their behalf and attempt to shield their files and Upright's

from discovery.  *Id.*

---

[43] At trial, Delafield denied the comments attributed to him.

## CONCLUSIONS OF LAW

### I.      Jurisdiction and Venue

This Court has jurisdiction of this matter by virtue of the provisions of 28 U.S.C. §§

1334(a) and 157(a) and (b) and the delegation made to this Court by Order from the District

Court on December 6, 1994, and Rule 3 of the Local Rules of the United States District Court for

the Western District of Virginia.  This Court further concludes that these matters are "core"

bankruptcy proceedings within the meaning of 28 U.S.C. § 157(b)(2)(A).  *See In the Matter of*

*Kenneth W. Paciocco*, Misc. Pro. No. 15-00302-KRH, 2015 WL 5178036 (Bankr. E.D. Va. Sept.

3, 2015).  A request for sanctions arising out of an attorney's conduct in a core proceeding is

itself a core proceeding.  *See, e.g., In re French Bourekas, Inc.,* 183 B.R. 695, 696 (Bankr. S.D.

N.Y. 1995).

### II.      The UST's Requests for Relief

The UST has asserted six counts against the Upright Defendants and Sperro.  Count I of

the Complaints each asks the Court to order Delafield, Morgan, LSC, and Upright to disgorge

fees under Section 329(a) and Section 105(a) of the Bankruptcy Code.  Count II of the

Complaints seek disgorgement of fees under 11 U.S.C. § 329(b) against Delafield, Upright,

Morgan, and LSC.  Count III of the Williams Complaint requests voiding of the fee agreement

and disgorgement under 11 U.S.C. §§ 526(c)(1) and 105(a) against Delafield, Upright and LSC.

Count III of the Scott Complaint and Count IV of the Williams Complaint seek an injunction

against Delafield, Morgan, Upright and LSC, enjoining them from violating 11 U.S.C. § 526.

Count V of Williams Complaint and Count IV of the Scott Complaint seek civil penalties under

11 U.S.C. § 526(c)(5)(B) against Delafield, Morgan, Upright Law LLC, and LSC, and Count VI

of the Williams Complaint and Count V of the Scott Complaint seek sanctions against all

Defendants under the Court's inherent powers. This last Count asks the Court to prohibit

Delafield, Morgan, LSC, Upright Law, LLC, Allen, Chern, and Scanlan from practicing before

this Court whether directly or indirectly through any companies in which they have ownership

interests or management authority. The UST contends that cause also exists to sanction them

monetarily. The Court is also asked to require Sperro and its affiliates to disgorge all funds

received as a result of the Sperro Program, and to enjoin Sperro and its affiliates from remitting

or providing any funds to LSC or Upright Law, LLC or to an affiliate, member, or agent of either

of those entities. In both Complaints, the UST further requests that the Court "take such action

as the court deems necessary to deter such misconduct and similar schemes in the future."

### III. Williams and Scott Counts I and II and Williams Count III: 11 U.S.C. §§ 329(a), 329(b), 526(c)(1) and 105(a)

Section 329 of the Bankruptcy Code provides as follows:

(a) Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

(b) If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to — (1) the estate, if the property transferred — (A) would have been property of the estate; or (B) was to be paid by or on behalf of the debtor under a plan under chapter 11, 12, or 13 of this title; or (2) the entity that made such payment.

11 U.S.C. § 329. As stated in *In re Levin*, Case No. 97-15574DWS, 1998 WL 732878 (Bankr.

E.D. Pa. Oct. 15, 1998), "[o]ne of the surest means for the bankruptcy system to come under

public disrepute is for the perception to take hold that it allows attorneys to milk the last cent out

of debtors while leaving creditors nothing. Also disturbing is the prospect that attorneys may be

able to extract a premium from debtors who are desperate to file in order to save an asset that is

on the brink of being lost.  These concerns, among others, have led Congress and the Courts to

enact and enforce strict regulations on the payment of attorney's fees in bankruptcy.  One of the

cornerstones of the regulatory structure is the necessity for attorneys to fully and honestly

disclose their transactions with clients."  *Levin*, 1998 WL 732878, at *2.

Section 329 reflects the Congressional concern that a debtor's payments to his attorney

present a "serious potential for evasion of creditor protection provisions of the bankruptcy laws."

H.R.Rep. No. 95–595, at 329 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6285.

> To that end, an attorney must "lay bare all [his] dealings" with the debtor
> concerning compensation.  *In re Saturley,* 131 B.R. 509, 517 (Bankr. D. Me.
> 1991).  The disclosures he makes must be "precise and complete."  *Berg,* 356
> B.R. at 381 (internal quotation omitted).  "Coy or incomplete disclosures" that
> force the court "to ferret out pertinent information" will not do, *Saturley,* 131 B.R.
> at 517; *see also Neben & Starrett, Inc. v. Chartwell Fin. Corp. (In re Park–
> Helena Corp.),* 63 F.3d 877, 881 (9th Cir. 1995), even if they are merely the result
> of negligence or inadvertence, *Jensen v. U.S. Trustee (In re Smitty's Truck Stop,
> Inc.),* 210 B.R. 844, 848-49 (10th Cir. BAP 1997).  Very simply, "[a]nything less
> than the full measure of disclosure" is unacceptable.  *Saturley,* 131 B.R. at 517.

*In re Jackson*, 401 B.R. 333, 339-40 (Bankr. N.D. Ill. 2009).

Because disclosure under Section 329(a) and Rule 2016(b) is "central to the integrity of

the bankruptcy process," failure to disclose is sanctionable.  *In re Andreas,* 373 B.R. 864, 872

(Bankr. N.D. Ill. 2007).  The sanctions can include partial or total denial of compensation as well

as partial or total disgorgement of fees paid.  *Id.*  "Many courts, perhaps the majority, punish

defective disclosure by denying all compensation."  *Id.; see, e.g., Mapother & Mapother, P.S.C.

v. Cooper (In re Downs)*, 103 F.3d 472, 477-78 (6th Cir. 1996).  However, other courts consider

the egregiousness of the conduct and the facts of a given case.  *See Charity v. NC Financial*

*Solutions of Utah, LLC (In re Charity)*, No. 16-31974-KLP, 2017 WL 3580173, at *26 (Bankr.

E.D. Va. Aug. 15, 2017).[44]

### A. Mootness

The Upright Defendants contend the UST's claims against them in Counts I, II, and III of

the Williams Complaint, and Count I and II of the Scott Complaint are moot, because, prior to

trial, they refunded to the Williamses and Scott all of the fees paid to LSC/Upright on both the

Williamses' and Scott's behalf.[45]  In Scott's case, Fenner & Associates sent extra funds on

Scott's behalf, and the Upright Defendants advise they are prepared to deliver those additional

funds, $100.00, to whomever the Court directs.  Because they have already surrendered the funds

to the Debtors, the Upright Defendants contend that any relief for disgorgement is moot.  *See*

*e.g., In re Bradley*, 495 B.R. 747, 792 (Bankr. S.D. Tex. 2013).  The Upright Defendants, in

effect, assert there is no case or controversy left for the Court to resolve as to the above

referenced Counts, and there is no need to cancel any contracts, because the contracts are fully

performed and the debtors have received their discharges.  In essence, the Upright Defendants

assert there is nothing left for Upright, Delafield, or Morgan to perform in their cases, and

cancelling a fully performed contract is basically a useless act.

As stated in *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754 (4th Cir. 2011):

> "[T]he doctrine of mootness constitutes a part of the constitutional limits of
> federal court jurisdiction. . . . [A] case is moot when the issues presented are no
> longer 'live' or the parties lack a legally cognizable interest in the outcome."

---

[44] "…[T]he Bankruptcy Code and Rules impose no requirement on debtor's counsel in a chapter 7 case to obtain court *approval* of his or her fees. . . . Rather, the duty is simply one of *disclosure*, with the court having the power to disapprove fees to the extent they are determined to be excessive *if* the reasonableness of the fees is raised either by the debtor or the United States Trustee, or by the court on its own motion. *See Burd v. Walters (In re Walters),* 868 F.2d 665 (4th Cir. 1989) (bankruptcy court had power to reduce fees of attorney hired by debtor to litigate against creditor in another forum from $29,000 to $15,000 even though the fees were being paid from exempt funds rather than estate assets)." *In re Hooper,* No. 93-11599-AB, 2001 WL 34054526, at *9 (Bankr. E.D. Va. Oct. 29, 2001).

[45] The Court denied a motion to dismiss to that effect shortly before trial.  Docket Nos. 162, 173, 189.

> *United States v. Hardy,* 545 F.3d 280, 283 (4th Cir. 2008) (internal quotation
> marks and citations omitted). *See also Iron Arrow Honor Soc'y v. Heckler,* 464
> U.S. 67, 70, 104 S.Ct. 373, 78 L.Ed.2d 58 (1983) ("Federal courts lack
> jurisdiction to decide moot cases because their constitutional authority extends
> only to actual cases or controversies."). "Mootness has been described as 'the
> doctrine of standing set in a time frame: The requisite personal interest that must
> exist at the commencement of the litigation (standing) must continue throughout
> its existence (mootness).'" *Arizonans for Official English v. Arizona,* 520 U.S. 43,
> 68 n. 22, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) (quoting *U.S. Parole Comm'n
> v. Geraghty,* 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980)).

*Id*. at 763.  The UST contends that the forgoing Counts are not moot, and that there is a live case

or controversy.

First, as to Count I of each Complaint, brought under Section 329(a) and 105(a), the UST

contends that the Upright Defendants failed to "disclose completely and accurately the

compensation paid in this case, in particular both the ultimate source of the compensation and the

sharing of compensation between the various entities involved."  Williams Complaint, ¶ 84;

Scott Complaint, ¶ 83.  In both Complaints, the UST asks the Court to use its authority under

Section 105(a) to require to LSC, Upright, Delafield and Morgan "to disgorge all fees."[46]  This

request is made in the body of Count I, whereas the requests for relief at the conclusion of all

counts are much broader.

Part of what the UST is targeting in Count I of the Complaints is the allegation that LSC

is not a law firm, and that the Rule 2016(b) disclosures are inaccurate and misleading under

Section 329(a) and Rule 2016(b).  Rule 2016(b) provides, in part, that "[t]he statement shall

include the particulars of any such sharing or agreement to share by the attorney, but the details

of any agreement for the sharing of the compensation with a member or regular associate of the

attorney's law firm shall not be required."  Fed. R. Bankr. P. 2016(b).  Count I of the Complaints

---

[46] In the Williams Complaint, the UST also asked that the Defendants be required to provide "restitution of the full
value of the converted property," but this request was withdrawn prior to trial at the hearing on the motion to
dismiss.

asserts that the "precise nature of the fee arrangement must be disclosed, not merely the identity

of the ultimate owner of the funds," and the Upright Defendants had an obligation to ensure the

filing of an accurate statement under Section 329(a) and Rule 2016(b). "Despite this, they failed

to disclose completely and accurately the compensation paid in this case, in particular both the

ultimate source of the compensation and the sharing of compensation between the various

entities involved." Complaints, Count I. Here, after this litigation commenced, the Upright

Defendants contend that they paid the Williamses $1,650.00 and Ms. Scott the sum of $1,835.00.

Thus, since the UST asks for disgorgement of those funds, the Upright Defendants assert there

would be no point in the Court ordering them to do what they have already done, and there is no

need to delve into the Rule 2016(b) disclosures.

The Court disagrees. There are approximately 15 additional cases pending in this Court

in which the UST has questioned the issue of fee sharing under LSC's business model and the

adequacy and manner in which its Rule 2016(b) disclosures are prepared and filed with the

Court.[47]  In several of those cases, the UST alleges that her Office "has filed several other

motions against[, among others,] LSC and Upright Law and alleged a pattern and practice of

misrepresentations to the Court regarding the details concerning fees and fee sharing.". *See, e.g.,*

Motion to Review Debtor's Transactions with Debt Relief Agencies and Order Disgorgement of

Attorney Fees Paid, *In re Holtz*, No. 16-50742 (docket no. 11). In *Knox v. Service Emps. Int'l*

*Union, Local 1000,* 567 U.S. 298, 132 S.Ct. 2277 (2012), the Supreme Court held that "[a] case

becomes moot only when it is impossible for a court to grant . . . any effectual relief whatever to

the prevailing party. . . . [A]s long as the parties have a concrete interest, however small, in the

outcome of the litigation, the case is not moot." (citations omitted). *Id.* at 2287. Moreover,

---

[47] The Court takes judicial notice of its own docket. The additional cases are set for a status conference on March
19, 2018.

There is a well-recognized exception to the mootness doctrine holding that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982); *see also United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) ("[V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot.").

The voluntary cessation exception "traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1, 121 S.Ct. 743, 148 L.Ed.2d 757 (2001). Accordingly, the exception seeks to prevent "a manipulative litigant immunizing itself from suit indefinitely, altering its behavior long enough to secure a dismissal and then reinstating it immediately after." *ACLU of Mass. v. U.S. Conference of Catholic Bishops*, 705 F.3d 44, 54–55 (1st Cir. 2013) (citing *Already, LLC v. Nike, Inc.*, – U.S. –, 133 S.Ct. 721, 727, 184 L.Ed.2d 553 (2013)); *see also Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 132 S.Ct. 2277, 2287, 183 L.Ed.2d 281 (2012) ("The voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed."). To that end, "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Laidlaw*, 528 U.S. at 190, 120 S.Ct. 693.

*Porter v. Clarke*, 852 F.3d 358, 363–64 (4th Cir. 2017).

The Upright Defendants continue to file cases in this Court under the existing business model, and the manner in which the Rule 2016(b) disclosures are prepared and filed is a recurring issue. To say that the Court cannot review their practices because in the two instances currently before the Court they paid the attorney's fees back to the debtors before the Court had a chance to rule on the adequacy of their disclosures would gut the "voluntary cessation" rule as described above. Moreover, in line with *Knox* above, the UST has asked the Court in each Complaint to take such other action as the Court deems necessary to deter such misconduct and similar schemes in the future," and the Court has that discretion under Section 105(a). There

remains a "concrete interest . . . in the outcome of this litigation," and the Court finds Counts I

and II of both Complaints, and Count III of the Williams Complaint, are not moot.[48]

### B. LSC as a law firm and the status of Delafield and Morgan as partners

The UST contends that cancellation of the retention agreements and disgorgement of

attorney's fees are appropriate in this case against Delafield, Morgan, Upright, and LSC because

they each failed to satisfy their disclosure obligations under the Bankruptcy Code and Rules.

UST Brief at 39.  The UST contends that the Rule 2016 certifications in these cases are

inaccurate and misleading.[49]  The UST asserts that Rule 2016(b) requires the disclosure of the

sharing of compensation between entities while not requiring the disclosure of sharing within a

firm.  Here, the UST argues that LSC does not fit the definition of a law firm and neither Morgan

nor Delafield qualify as a bona fide partner of LSC for purposes of Rule 2016(b).  Therefore,

LSC's undisclosed sharing of fees with Morgan and Delafield is improper.  *Id.* at 41.  Bluntly

stated, the UST characterizes the collective Upright entities, with Chern, Scanlan, and Allen at

LSC's helm, as nothing more than a "boiler room and mere forwarder of legal business," and a

"call center employing sales people and hard sell tactics to collect money" from, among others,

Virginia residents.  *Id.* at 42.  The UST argues (1) that LSC is not properly registered with the

Virginia State Bar, (2) that it is not organized to deliver legal services to Virginia residents, (3)

---

[48] As to Count II of the Complaints, the additional question arises as to whom should the funds should be disgorged?
Section 329(b) provides that the court may order the return of any such payment to "(1) the estate, if the property
transferred— (A) would have been property of the estate; or (B) was to be paid by or on behalf of the debtor under a
plan under chapter 11, 12, or 13 of this title; or (2) the entity that made such payment."  11 U.S.C. § 329(b).  This is
an open question for the Court, not the Upright Defendants, to decide.

[49] Fed. R. Bankr. P. 2016(b) provides as follows: ". . . (b) Disclosure of Compensation Paid or Promised to Attorney
for Debtor.  Every attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit
to the United States trustee within 14 days after the order for relief, or at another time as the court may direct, the
statement required by § 329 of the Code including whether the attorney has shared or agreed to share the
compensation with any other entity. The statement shall include the particulars of any such sharing or agreement to
share by the attorney, but the details of any agreement for the sharing of the compensation with a member or regular
associate of the attorney's law firm shall not be required. A supplemental statement shall be filed and transmitted to
the United States trustee within 14 days after any payment or agreement not previously disclosed."

that it encourages the unauthorized practice of law, (4) that there is an inability to perform meaningful conflicts checks, and (5) that a real law firm would have reasonable oversight procedures.  *Id.* at 42-43.  Further, the UST contends that Scanlan is a secret owner of the firm, disqualifying it as a law firm.

The UST then argues that even if LSC could be considered a law firm, Morgan, Delafield and Upright Law, LLC, the Virginia entity, are not *bona fide* partners in LSC.  Even though Morgan and Delafield testified that they thought they were "partners" in LSC, the UST contends the evidence shows they were not.  As examples of this lack of *bona fides*, Morgan and Delafield have no legal access to partnership documents that the law permits them to have, and the partnership agreements expressly provide that they have no right to participate in the management of the firm.  The local partners are generally prohibited from collecting money from clients and the agreements attempt to prohibit local partners from soliciting clients upon disassociation from the firm.  That the local partners receive no portion of the fees from files that were closed without a case being filed is another factor the UST relies upon.  *Id.* at 44.

LSC, in turn, contends that LSC and Upright, with Delafield and Morgan as local partners, are very much a true law firm, both in form and substance.  LSC contends that it is sufficient for an attorney to simply be a "member," "partner," or "regular associate," which are all terms Section 101 of the Bankruptcy Code leaves undefined.  11 U.S.C. § 101.  Thus, LSC contends courts apply this section in a practical manner, recognizing that different law firms have varying types of structures and varying relationships with their attorneys.  LSC contends that Delafield and Morgan have a true partnership relationship with Upright.  It enters into partnership agreements with its local partners.  They are provided with malpractice insurance. The local partners, albeit while maintaining their separate law practices, hold themselves out to

the general public with the title, style and attribute of a "partner," and the partners are supposed

to take reasonable steps to advise their clients of their affiliation with Upright.  Moreover,

Morgan and Delafield share in the firm's revenues and receive a Schedule K-1 to report their

Upright-related income, not a W-2 nor a Form 1099.[50]  Chern also testified that the local partners

participate in partnership meetings with him, and they are invited to an annual partnership

meeting in Chicago. They also receive regular newsletters and have direct communication with

him to share concerns and to discuss issues with the firm and clients.

In *Futreal*, this Court observed – addressing Prince Law's ill-fated foray into Virginia –

that these multi-jurisdictional local partner arrangements "are often nothing more than disguised

independent contractor arrangements designed to increase revenue streams by attempting to

evade the fee splitting prohibitions in the Bankruptcy Code and Bankruptcy Rules." *Futreal*,

2016 Bankr. Lexis 3974, at *42.[51]  Further, in *Banner*, addressing the Volks Anwalt firm and its

managing partner Jessica McClean, Judge Beyer observed:

> While Volks Anwalt has "partners" other than McClean, they have no voting
> rights, own only nominal shares in the firm, and have no authority, control, or
> input over the operations and management of Volks Anwalt.  The only authority
> that these "partners" may have is with respect to case management of their
> assigned cases in their localities. McClean controls all matters related to the
> business of Volks Anwalt, including overseeing all financial, marketing, and
> human resources activities.

---

[50] In 2016, LSC filed a composite tax return in Virginia, and the record reflects the Schedule K-1's received by
Morgan and Delafield were from LSC, not Upright Law, LLC, a Virginia limited liability company.  Upright Ex. P5,
p. 39.  No Schedule K-1 was provided from the Virginia entity, which is the entity with which Morgan and Delafield
had partnership agreements.

[51] Another "multi-jurisdictional" firm using a local attorney arrangement, Volks Anwalt, was barred from practicing
in the Western District of Virginia under an agreement with the UST for a period of three years.  *In re Glover*, No.
15-61476 (Bankr. W.D. Va. Dec. 15, 2015).  Volks Anwalt was also sanctioned by the Western District of North
Carolina and disbarred from that court for a period of five years.  *In re Banner*, No. 15-31761, 2016 WL 3251886
(Bankr. W.D. N.C. June 2, 2016).  The firm was also sanctioned in Hawaii, as was its local counsel.  *In re
Hanawahine*, 577 B.R. 573 (Bankr. D. Hawaii 2017) (disciplining Volks Anwalt and its local partner for abandoning
client).

*Banner*, at *3.  The Court in *Banner* also observed that the Volks Anwalt local "partners," in her estimation, "were not legitimate partners" in the firm.  *Id*. at *9, n.39.

While the Upright/LSC firm bears many similarities with that of Prince Law and Volks Anwalt, including the observations of Judge Beyer quoted above, it is a much more sophisticated and structured operation, perhaps because it is formed and operated by individuals, albeit self-described, experienced in law firm operations and internet marketing.  Without limitation, efforts have been made to register the Virginia entity with the Virginia State Bar, as well as to qualify it to do business in Virginia and elsewhere.[52]  The firm shares client information with its local partners through its SalesForce case management software system, such that Chicago and the local offices can work on files together, and the local partners are given significant involvement in the preparation, filing and management of the clients' cases, more so now than when Upright first started.  LSC/Upright has a conflicts check system whereby it can run conflicts against its local partners' Upright clients, although it cannot run conflicts checks against those local partners' clients in their separate law practices.  For example, neither LSC/Upright nor Morgan can check their client database against Delafield's non-Upright client database.  The local partners can check their non-Upright client databases against the larger Upright client database, and based on Chern's testimony, this has not presented a problem in day-to-day operations, since the local partners rarely represent creditors.  The Court is deeply disturbed by the lack of effective oversight of its sales people and methods used by LSC/Upright to sell its product, which will be addressed in more detail to follow, as well as the way it provides services and

---

[52] The Court acknowledges that, for a period of time, Upright was providing legal services in Virginia and in this Court without being properly qualified to do so.  The Court further understands and appreciates the UST's position that the registration was both improperly prepared and untimely filed, and that the registration on file is for Upright Law, the Virginia entity, and not LSC.  The Virginia State Bar has taken no action against any of the collective Upright entities for their registration deficiencies.  Chern, Tr. 206, Day 3.  At this point, the Court will leave the consequences of those deficiencies, if any, to the proper State authorities.

utilizes Virginia lawyers to do so in this District.  However, it cannot say LSC is not a law firm.[53]

Under the Virginia Rules of Professional Conduct, "firm," or "law firm" "denotes a professional entity, public or private, organized to deliver legal services, or a legal department of a corporation or other organization."  Va. R. Prof'l Conduct, Preamble, Terminology.  A comment to Rule 1.10 provides as follows:

> Whether two or more lawyers constitute a firm as defined in the Terminology section can depend on the specific facts. For example, two practitioners who share office space and occasionally consult or assist each other ordinarily would not be regarded as constituting a firm. *However, if they present themselves to the public in a way suggesting that they are a firm or conduct themselves as a firm, they should be regarded as a firm for the purposes of the Rules. The terms of any formal agreement between associated lawyers are relevant in determining whether they are a firm, as is the fact that they have mutual access to information concerning the clients they serve.* Furthermore, it is relevant in doubtful cases to consider the underlying purpose of the Rule that is involved. A group of lawyers could be regarded as a firm for purposes of the Rule that the same lawyer should not represent opposing parties in litigation, while it might not be so regarded for purposes of the Rule that information acquired by one lawyer is attributed to the other.

Va. R. Prof'l Conduct, 1.10 Cmt. [1] (emphasis added).

The Court recognizes that compliance with both Section 329 and Rule 2016(b) are questions of federal, not state, law.  But, the comment above is not inconsistent with Federal Rules of Bankruptcy Procedure 9001(6) and (10).  Those provisions find that for the purposes of the Bankruptcy Rules, "Firm" includes "a partnership or professional corporation of attorneys or accountants", and "Regular associate" means "any attorney regularly employed by, associated with, or counsel to an individual or firm."  Fed. R. Bankr. P. 9001(6), (10).  Although raised in a

---

[53] Scanlan's role in LSC is concerning to the Court as well.  It is clear to the Court from the undercurrents at trial that while Scanlan is not one of the technical, legal owners of LSC, his hand is never far from the wheel.  Moreover, the federal tax return admitted as Upright Ex. P5 reflects substantial portions of LSC's legal services revenues are channeled to both Royce Marketing and Mighty Legal for marketing and employee leasing services, which flow down to Justiva and ultimately to Scanlan.

somewhat different context, the Court appreciates Judge Chapman's observation in *In re GSC*

*Grp., Inc.*, 502 B.R. 673 (Bankr. S.D. N.Y. 2013), that:

> [m]uch has changed in the way law firms are organized since the founding of the earliest American firms in New York in the late eighteenth century. The complex, multinational structures of today's law firms would hardly be recognizable to the general partners of these early firms. Law firms today, as well as accounting and financial advisory firms, are comprised of partnerships, limited liability partnerships, professional corporations, limited liability companies—and combinations thereof. . . . Moreover, the titles and status afforded lawyers who practice in such firms have also evolved, along with the perquisites associated therewith; twenty-first century law firms include equity partners, non-equity partners, contract partners, shareholders, associates, contract associates, counsel, of counsel, senior counsel, and the list goes on. . . . Gone are the days of the professional universe being neatly divided into members and associates—and lawyers and accountants—as contemplated by the Code and the Rules.

*Id*. at 735, n.227.[54]

Mindful of the above, the Court turns to Delafield's and Morgan's relationship with

LSC/Upright.  Although styled as "limited partners" with no rights to management of the firm,

the Court takes a more holistic approach.  Looking to substance over form with regard to the

partnership agreements and the record in this case, including the method and manner of

Delafield's and Morgan's interactions with LSC in Chicago, the Court is satisfied that both

Morgan and Delafield are "regularly associated with" or "counsel to" the "firm," of which the

local Virginia LLC in which Delafield and Morgan are limited partners is a component part.

Thus, the Rule 2016(b) disclosures are not deficient on the basis that LSC/Upright is not a law

firm and that Delafield's and Morgan's relationships with it are impermissible.  The Court finds

that the statements in the Rule 2016(b) disclosures by Delafield and Morgan that "I have not

agreed to share the above-disclosed compensation with any other persons unless they are

members and associates of my law firm" are not actionable in these cases.  Disgorgement and

---

[54] The Court wrestled with this conclusion, especially given the admonition against treating bankruptcy cases as a "matter of traffic." *See In re Worldwide Direct, Inc.*, 316 B.R. 637, 646 (D. Del. 2004).

cancellation of the retention agreements between LSC/Upright, the Williamses, and Scott will

not be ordered on that basis.

### C. **Additional Rule 2016(b) and engagement deficiencies**

Chern testified that the Rule 2016(b) disclosures were and still are prepared in Chicago.

Chern, Tr. 197, Day 3.[55]  The UST argues that from May 12, 2015, when Fenner sent Chern the

email outlining the operation of the "New Car Custody Program," LSC knew that Fenner &

Associates would be the source of payments for those clients participating in the Sperro

Program.  Even though Fenner & Associates was controlled by the same person as Sperro,

Fenner & Associates actually wrote the checks to LSC/Upright.  Nevertheless, when the Rule

2016(b) disclosures were filed for the Williamses and Scott, they failed to disclose that Fenner &

Associates paid the fee instead of Sperro.  To date, the UST points out no amended Rule 2016(b)

disclosure has been filed in either case correcting the actual remitter of the fees.

The UST also complains that the engagement agreements between Upright and the

Williamses and Scott contained misrepresentations and were also unclear or inaccurate.[56]

Among the UST's contentions are that the engagement agreements misrepresented the local

attorneys' true hourly rates.  The Williamses' and Scott's retainer agreements appear to be form

agreements used in the Western District of Virginia and elsewhere, and the hourly rate

substantially exceeds the market rate for such services in this District.  It appears the agreements

specified rates of $395.00 per hour regardless of the fees the attorney actually charged, although

Morgan's time records did specify $395.00 an hour in Scott's case.[57]  Further, in violation of

---

[55] Delafield at one point testified he prepared the Williamses' 2016(b) disclosure. That does not appear to have been the case. UST Ex. 23, Tr. p. 208.
[56] For example, the Williamses' engagement agreement indicated amendments to schedules were included in the flat fee, while in another portion of the same agreement, those services were excluded. UST Ex. 3-24, ¶¶ 8(f), 9(h).
[57] Delafield's true local rate on the Williamses' file appears to have been $200.00 per hour. UST Ex. 3-23.  In Scott's case, every attorney involved appears to have billed $395.00 per hour, regardless of whether they were an

Virginia ethics rules, the engagement agreements contained provisions that funds paid were earned when paid.[58]  The UST further contends that in Scott's case, the Rule 2016(b) disclosure reflects that Morgan and Upright agreed to accept $1,500.00 for legal services initially, but were paid $1,650.00 and the disclosure did not reflect the $100.00 that Scott paid.

As to the Williamses, the UST contends that a "debt relief agency" is required to give an assisted person an executed written contract within 5 business days of first offering bankruptcy assistance to the assisted person.  11 U.S.C. § 528(a)(1).  The written contract is required to explain "clearly and conspicuously - (A) the services such agency will provide to such assisted person; and (B) the fees or charges for such services, and the terms of payment."  *Id.*  The debt relief agency is also required to give the assisted person a "copy of the fully executed and completed contract."  11 U.S.C. § 528(a)(2).  "Any contract for bankruptcy assistance between a debt relief agency and an assisted person that does not comply with the material requirements of this section, section 527, or section 528 shall be void. . . ." 11 U.S.C. § 526(c)(1).[59]

LSC, Upright, Delafield and Morgan stipulated they are "debt relief agencies."  Stip. ¶ 10.  The Williamses and Scott are "assisted persons" as defined in the Code.  LSC/Upright clearly provided "bankruptcy assistance" to the Williamses well before they received the written

---

[57] associate or partner.  The veracity of Upright's time records for Scott's case are questionable to the Court.  See pp. 27-28, *supra.*

[58] It appears that from 2014 through March 2016, attorney's fees were placed directly into LSC's Illinois general operating account or LSC's Virginia operating account.  In response to an Interrogatory, LSC stated, in part, as follows: "LSC states the following that it is currently in compliance with Virginia's IOLTA rules.  However, LSC and Upright initially misinterpreted the Virginia IOLTA Rules and found out this was the case in March 2016. At that time, they immediately began depositing all new Virginia client funds into its Virginia, IOLTA account and began an audit of payments received and earned from its Virginia clients.  After completion of the audit and determining the proper amounts that should be in (and or replenished into) the Virginia IOLTA account, the IOLTA account was properly replenished. This process was completed in October 2016. . . ." UST Ex. 2, p. 4.

[59] These are but a fraction of the UST's complaints about Upright's engagement agreements and retention procedures in these cases.  *Cf. Lyda v. City of Detroit (In re City of Detroit)*, No. 13-53846, 2014 WL 6474081, at *7 (Bankr. E.D. Mich. Nov. 19, 2014) ("These allegations have an 'everything but the kitchen sink' quality that makes them challenging to parse through.").  In the future, the Court trusts the UST will take a more focused approach on such matters.

contract from Upright.[60]  In fact, and without limitation in terms of bankruptcy assistance, it appears their car was picked up on Upright's Sperro referral long before they ever saw a written contract that fell within the scope of Section 528(a).[61]  Without addressing each and every UST alleged violation of Section 528(a) as to the Williamses, it is clear from the record that Upright violated Section 528(a) as to the Williamses based on the timing of the delivery of the written agreement.  The contract between Upright and the Williamses is declared void pursuant to Count III of the Williams Complaint.

Further placing the Williamses and Ms. Scott into the Sperro Program is a sufficient basis to declare Upright's fee to be unreasonable in both the Williams and Scott cases under Section 329(b).  What these individuals have had to endure as a result of the actions of LSC, Chern, Upright, Delafield and Morgan is unconscionable.  Section 329(b) provides that the court "may cancel any such agreement, *or* order the return of any such payment to the extent excessive, to – (1) the estate, if the property transferred – (A) would have been property of the estate; or (B) was to be paid by or on behalf of the debtor under chapter 11, 12, or 13 of this title; or (2) the entity that made such payment."  11 U.S.C. § 329(b) (emphasis added).  Here, the Court sees little point in cancelling the agreements between Upright, the Williamses, and Scott. The Williamses' agreement has already been declared void under Section 526(c)(2) for violating Section 528(a). Scott and the Williamses have received their discharges and moved on with their lives.  The pendency of these adversary proceedings is what is keeping their cases from being closed.

---

[60] "The term 'bankruptcy assistance' means any goods or services sold or otherwise provided to an assisted person with the express or implied purpose of providing information, advice, counsel, document preparation, or filing, or attendance at a creditors' meeting or appearing in a case or proceeding on behalf of another or providing legal representation with respect to a case or proceeding under this title."  11 U.S.C. § 101(4A).

[61] UST Ex. 3-5, p. 6 reflects the written retainer agreement was "completed" for the Williamses on September 30, 2015.  The agreement was signed October 16, 2015.  UST Ex. 3-24.  No fully executed contract signed by Upright or Delafield was introduced.  The Williamses' first contact with Upright at which time "bankruptcy assistance" was provided was on August 27, 2015.

The Court acknowledges that after this litigation ensued, Upright on its own paid the Williamses and Scott funds received on their behalf – for the most part.  Upright is still holding approximately $100.00 in excess funds on Scott's behalf.[62]  However, the Court believes that all funds received by Upright in these cases should be remitted back to the debtors' estates.  The money Fenner & Associates paid to Upright on behalf of the Williamses and Scott in connection with the Sperro Program would not necessarily have been estate property, because it does not appear that the funds paid were traceable to proceeds of the sale of the debtors' vehicles.  The funds were paid to Upright well before the vehicles were sold.  Nevertheless, the legal fees were paid to Upright as a *quid pro quo* for the surrender of what would have been estate property, albeit property subject to a lien that the trustee would likely have abandoned (assuming perfection of the lender's security documents).  This nexus to what would have been estate property is sufficient for the Court to conclude that the Chapter 7 trustees ought to have the opportunity to consider the disposition of the funds returned by Upright, as small as the dollar amounts may be, and who may be entitled to those funds.  That Upright jumped the gun and paid funds to the Williamses and Scott voluntarily after litigation commenced is a loss Upright will have to bear.  The Court will grant the UST's requests in both Counts I and II of the Scott and Williams Complaints that the fees received by Upright be delivered to the estates in those cases. The UST's request that fee agreements be cancelled is denied.

---

[62] It appears that Upright received $1,750.00 in attorney's fees on Scott's case. Apart from filing fees, Upright received $1,650.00 from Fenner & Associates for the Sperro Program, and $100.00 from Scott.  Upright refunded Scott $100.00 on her debit card on June 8, 2016, then it sent her an additional $1,550.00 on July 28, 2016.   UST Ex. 4-14.

IV.  **Williams Count IV and Scott Count III – Injunction under 11 U.S.C. §
526(c)(5)(A)**

In the above referenced Counts, the UST seeks injunctions against LSC, Upright,

Delafield, and Morgan to enjoin them "from violating 11 U.S.C. § 526."  Williams, Complaint ¶

100; Scott, Complaint, ¶ 96.  The Court has already found that LSC is a law firm and that the

Rule 2016(b) disclosures are not deficient on that basis alone.

The Court is aware of another recent decision, *In re Bishop*, involving Upright and the

UST, where some, but not all, of the same issues in this case were raised. [63]  *See In re Bishop*,

578 B.R. 158 (Bankr. W.D. N.Y. 2017).  In that case, as here, the UST alleged the individual

local attorney and the Upright Defendants "have engaged in a clear and consistent pattern of

filing false and misleading disclosures of compensation in other Upright Cases."  *Id.* at 166.  The

UST also sought to have the Court enjoin the defendants "from violating 11 U.S.C. § 526."  *Id.*

The *Bishop* court observed that, while the injunction request tracked the language of 11

U.S.C. § 526(c)(5)(A), "'when Congress authorizes injunctive relief, it implicitly requires that

the traditional requirements for an injunction be met in addition to any elements explicitly

specified in the statute.'"  *Id.* at 166 (citing *Klay v. United Healthgroup, Inc*., 376 F.3d 1092,

1098 (11th Cir. 2004)).  The Court went on to observe that an order granting an injunction must

meet the specific requirements of Federal Rule of Civil Procedure 65, and as the Second Circuit

has noted, "'an injunction must be more specific than a simple command that the defendant obey

the law.'"  *Bishop*, 578 B.R. at 199 (citing *Peregrine Myanmar v. Segal*, 89 F.3d 41, 51 (2d Cir.

1996)). [64]  As stated in *Bishop*, an injunction simply to order the defendants to obey the law and

---

[63] Neither the New Car Custody Program, Sperro, nor Fenner & Associates appeared to be implicated in *Bishop*.

[64] The Fourth Circuit acknowledged this argument in *U.S. S.E.C. v. Pirate Inv'r LLC*, 580 F.3d 233, 255 (4th Cir.
2009), observing that "Federal Rule of Civil Procedure 65(d) requires that injunctions 'describe in reasonable detail .
. . the act or acts restrained or required,' and several circuits have relied on Rule 65(d) to require that injunctions do
more than instruct a defendant to 'obey the law.'  *See, e.g., Burton v. City of Belle Glade,* 178 F.3d 1175, 1201 (11th

not violate Section 526 would be difficult to police and run afoul of Rule 65. Accordingly,

Williams Count IV and Scott Count III will be dismissed.[65]

## V.    Williams Count VI and Scott Count V – Section 105(a) and the Court's Inherent Authority

"A federal court has an inherent power 'to control admission to its bar and to discipline

attorneys who appear before it.'" *Paciocco,* 2015 WL 5178036 (citing *In re Parker,* No.

3:14cv241, 2014 WL 4809844, at *5 (E.D. Va. Sept. 26, 2014) (quoting *Chambers v. NASCO,*

*Inc.,* 501 U.S. 32, 43 (1991))). "This inherent power extends to bankruptcy courts and 'includes

the power to suspend or disbar attorneys from practicing before the court.'" *Paciocco,* at *1

(citing *Williams v. Lynch (In re Lewis),* No. 141881, 2015 WL 3561277, at *2 (4th Cir. Jun. 9,

2015) (citing *In re Snyder,* 472 U.S. 634, 643, 105 S. Ct. 2874 (1985))). Further, Section 105(a)

authorizes a bankruptcy court to "issue any order, process, or judgment that is necessary to carry

out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a); *In re Circle T Pipeline*, No.

11-70556, 2011 WL 9688240, at *12 (Bankr. W.D. Va. April 27, 2011). Two years ago,

discussing the "national law firm" business model and the use of local, limited partners, this

Court made the following observation:

> These cases raise several questions as to who, if anybody, has oversight authority
> over these arrangements: Is it the state disciplinary authority where the law firm
> retains local counsel, or is it the authority where the law firm is physically
> located? If the former, when the ultimate sanction is to take a license, what power
> does that bar have to discipline attorneys who have no license to begin with? If
> the latter, does the bar have power to sanction local attorneys for actions that may
> have occurred in cases conducted in another state? Who has disciplinary and

---

Cir. 1999); *Payne v. Travenol Labs., Inc.,* 565 F.2d 895, 897–98 (5th Cir.1978)." The Fourth Circuit did not take up this issue, however, as it was raised for the first time on appeal.

[65] The UST should know that this Court also agrees with the caution in *Bishop* about the use of "shotgun" pleadings. In *Bishop,* Judge Warren referred to *Weiland v. Palm Beach Cnty. Sheriff's Office,* 792 F.3d 1313, 1318–26 (11th Cir. 2015), which categorized the 4 types of shotgun pleadings. "[T]he most common type—by a long shot—is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint)." *Bishop,* 578 B.R. at 167–68. The Complaints in this case suffer from a virtually identical affliction.

ethical authority over the client's fees and the attorney's trust account when the fees are paid out of state and the local attorney doing the work has no oversight or direct access to them? Do disciplinary authorities in multiple states have the ability to coordinate their efforts?

*Futreal*, 2016 Bankr. LEXIS 3974, at *41.  As this case further demonstrates, the issues are complex, recurring, and multi-jurisdictional.  It may well be that the federal courts in which the practices most often arise may be the most able and efficient places to draw lines.

As stated in *In re Burton*, 442 B.R. 421, 467 (Bankr. W.D. N.C. 2009), "[a] court exercises the authority to sanction attorneys with due restraint. When disciplining an attorney, the court must fashion an appropriate sanction without overreaching." (citing *Byrd v. Hopson,* 108 Fed.Appx. 749, 756 (4th Cir. 2004)).  Further, *Burton* held that "[c]ourts should impose the minimum sanction necessary to both protect the public and deter future misconduct. . . .  To this effect, courts are inclined to discipline a first offense with a lesser sanction and increase the severity of the discipline for any subsequent infractions, while taking into account previous failed attempts to discipline the attorney."  *Burton,* at 467.  In this case, the Sperro/New Car Custody Program was a scam from the start.  Despite Chern's protestations to the contrary, the Court believes he was well aware that cars were being towed out of state as early as June 18, 2015, or even earlier.  UST Ex. 35-55; UST Ex. 35-37.  The only purpose for doing so was to prime the secured lender's lien under more favorable state law towing and garagemen's liens, while running up exorbitant fees, and it benefitted Upright by getting their attorney's fees paid faster.  As can be seen by a multitude of exhibits, including the Sales Playbook and scripts, the leadership of Upright constantly had its concerns on cash flow.[66]  The fact that this Program was

---

[66] Chern testified in part that, with regard to Upright's usage of the Playbook and its aggressive sales techniques, ". . . we train our client consultants to compete against other lawyers for the representation of the clients. Why they should use our services verses another attorney's services."  Chern Tr. 12-13, Day 4.  Further, these techniques are to "motivate a consumer to take an action to actually start advancing their own best interest which sometimes they just

offered or suggested to debtors before they even had the chance to speak to an attorney makes it

all the more egregious.  Chern testified as follows:

> Remember, we never made participating in the Sperro program a condition of
> working with Upright Law. In other words, we said to the debtor, "if you are
> interested in using this program, go ahead. But if you decide you don't want to use
> the program, that's fine too but you're responsible for the payment of your own
> legal fees."

Chern, Tr. 106, Day 3.  Making this proposal to cash-strapped debtors was essentially offering

them a Hobson's choice – one the debtors had to make without legal advice – all while Upright

was offering its services under the guise of helping them make the proper decisions to reach their

"financial independence."  Upright preyed upon some of the most vulnerable in our society – as

the Williamses demonstrated – while they were under great stress.  The Williamses were only 20

and 21 years old, with two children, when the Sperro New Car Custody Program was proposed

to them.  UST Ex. 3-20, pp. 3-4; UST Ex. 3-15, p. 72.  Many of the debtors have had to take time

off from work to either appear in Court or be deposed in this case, and the anxiety placed upon

them permeates both the testimony and written communications.  The debtors were left to

question if they did anything wrong, as well as the consequences they might face, without proper

guidance and assurance.

Of no lesser import is the impact upon an untold number of vehicle creditors.[67]  The

record reflects that 217 Upright clients participated in the New Car Custody Program nationally,

but how many different creditors lost their collateral after being caught up in it is not readily

clear, nor is the dollar value of collateral converted or the amount of funds Sperro and/or Fenner

& Associates ultimately pocketed.  The Court does know that Upright received an amount of not

---

don't act in the best self-interest." *Id*. at 14.  The Court found Chern's overall emphasis on sales and profit to be far
more credible than his goals of helping consumers execute on decisions they had already made in their own minds.
[67] Chern testified that he felt remorse for the Sperro Program, that it was a "horrible" mistake, and that he felt
"horrible" that he put his partners and their professional reputations at risk, acknowledging that there were "red flags
that I should have given more credence to." Chern, Tr. 119-120, 278, Day 3.

less than $333,545.00 in fees from Fenner/Sperro in payment of legal fees.  This is exclusive of

filing fees.  As shown by the language of the security agreements with the Williamses' and

Scott's lenders, hiding and intentionally removing their collateral from Virginia and facilitating

the imposition of state law liens against it was contrary to the debtors' contractual obligations to

their lenders.[68]  There is no credible evidence that Chern or anybody at Upright gave serious

thought or concern to this.

Chern's testimony about being intrigued about Fenner's pitch that the New Car Custody

Program could be a benefit to Upright's customers, taking the burdens of maintaining and

surrendering the collateral off their shoulders, was not credible, nor was his belief that he was

really trying to help his clients.  Chern, Tr. 278, Day 3.  On May 21, 2015, Chern even inquired

if there was a way for a consumer to waive the 30-day hold requirement of Indiana law to see if

the mechanic's lien could attach sooner.  UST Ex. 35-37.  Moreover, Chern was also angling for

a separate $150.00 fee for his separate "marketing company."  UST Ex. 35-54.  As the legal fees

and filing fees were running on average between $1,800 to $2,000, Chern, clearly a financially

astute businessman, had to know that Fenner and Sperro had to charge more than that to make a

profit.  Fenner's initial pitch email stated as much.[69]  Two former Upright clients, Russell

McGuire and Regina White, testified that their cars were sold with Sperro having incurred

charges of between $4,500 and $5,000.  McGuire, White Tr. 236, 249, Day 1.  It was also not

credible that Chern could have believed that the New Car Custody Program was some kind of a

---

[68] In Virginia, it may also be a crime.  Va. Code § 18.2-115 provides, in part, as follows: "Whenever any person is in possession of any personal property, including motor vehicles or farm products, in any capacity, the title or ownership of which he has agreed in writing shall be or remain in another, or on which he has given a lien, and such person so in possession shall fraudulently sell, pledge, pawn or remove such property from the premises where it has been agreed that it shall remain, and refuse to disclose the location thereof, or otherwise dispose of the property or fraudulently remove the same from the Commonwealth, without the written consent of the owner or lienor or the person in whom the title is, or, if such writing be a deed of trust, without the written consent of the trustee or beneficiary in such deed of trust, he shall be deemed guilty of the larceny thereof."
[69] See quoted language in UST Ex. 35-18, *supra* p. 18.

loss-leader for Fenner, or that Fenner could somehow make his auction services attractive to the

vehicle lenders after Fenner towed their collateral hundreds of miles to states where their

financing liens could be primed in violation of contractual covenants with their borrowers.[70]

Despite red flags of being a "scam," including one local partner questioning it as such on June

18, 2015,[71] Chern went forward with the rollout on June 18, 2015.[72]

Considering (1) the hard sell tactics encouraged on its sales people, (2) the transcripts of

the actual recordings of the calls with clients, (3) the lack of supervision and control over its

salespeople in connection with the unauthorized practice of law, due in no small part to the

commission and sales structure imposed upon them, (4) the focus on cash flow over professional

responsibility, and (5) the participation in the Sperro Program and the record as a whole,

including Upright's efforts to get the Williamses and Scott to assert the attorney-client privilege

in a thinly-veiled attempt to cover its own tracks, this Court believes that the Upright Defendants

---

[70] This point is borne out by a recent opinion of the Indiana Court Appeals, after Sperro was sued by Ford Motor Credit Company over the "Sperro Plan." In *Sperro LLC v. Ford Motor Credit Co., LLC*, 64 N.E.3d 235 (Ind. App. 2016), the Court observed that "[u]nder the Sperro Plan, Sperro established contacts with numerous consumer bankruptcy attorneys throughout the United States, who would notify Sperro when a prospective bankruptcy client had a financed vehicle that he or she could no longer afford to make the payments on. Although such vehicles would normally be voluntarily surrendered to the secured creditor, Sperro would offer to pay the client's bankruptcy legal fees in exchange for the client's agreement to have the vehicle towed to Indiana and stored pursuant to a Transporting and Storage Authorization Agreement ('TSAA')." *Id.* at 239-240. Further, "Sperro transported the Vehicles from New Mexico, California, Louisiana, and Arizona to its Storage Yards in Indianapolis." *Id.* The Indiana Court of Appeals upheld, among other things, a trial court injunction finding in that "Sperro's business was to transport and store collateral, and therefore Fenner had to know that all the vehicles surrendered to Sperro pursuant to the TSSA's have been financed and are subject to the liens. Fenner's business experience supports the trial court's conclusions that he had or should have had general knowledge that the Borrowers purchased the Vehicles pursuant to retail installment contracts and the provisions generally included therein. Accordingly, the trial court did not err in concluding that Sperro and Fenner intentionally induced the breach of the Installment Contracts between the Borrowers and FMCC or proceeded with reckless disregard of the contractual relationship between the Borrowers and FMCC. Therefore, we affirm the trial court in all respects." *Id.* at 250.

[71] In a June 8, 2015 email from Allen to Chern, Allen stated: "It might be time to send an email to the partners about the program. We just had a client who surrendered his car, then talked to the partner for the compliance call, where the partner attorney told our client it sounded like a scam. Then of course the client calls in freaking out." UST Ex. 35-47.

[72] Chern testified that he tried to send notices to secured lenders earlier than Fenner wanted, but in the Williams case, that was sent to the wrong creditor at the wrong address. That was effectively no notice at all, as GCB's attorney showed up at the Williamses' 341 meeting to inquire as to the status of the car. Moreover, by the time the notices in the record were sent, the vehicles were well on their way to, if not already in, Indiana at $1.50 a mile, plus a $75 loading fee, and $45 per day storage. UST Ex. 35-53. The distance from the Williamses' residence in Saltville, Virginia to the Sperro lot in Indiana is approximately 420 miles one way per Google driving directions.

have acted in bad faith and the privileges of LSC, Upright Law, Chern, and Allen to file or

conduct cases, directly or indirectly, in the Western District of Virginia shall be revoked for a

period of five (5) years.[73]  This includes any firm that that LSC, Upright Law, Allen, or Chern,

directly or indirectly, have an ownership interest in or control over.  Further, LSC, Upright,

Chern, Allen, Scanlan and Sperro shall be fined collectively the sum of $250,000.00.[74]  Chern

shall be separately and personally fined the sum of $50,000.00 for his participation in and

leadership of the Sperro scheme.  Given LSC's financial resources and revenues in particular, as

reflected by its tax returns and evidence of receipts from residents of the Western District of

Virginia, these sums are appropriate in an effort to deter future misconduct.  A lesser sanction

would not be more appropriate.[75]  These fines are to be paid to the Office of the United States

Trustee within thirty (30) days of the Court's Order becoming final and unappealable.

Delafield and Morgan bear responsibility for their actions as well.  Delafield did do some

things correctly:  He met with his clients, he witnessed their signatures on the petition and

schedules, and he went over the petition and schedules with them and explained things as an

attorney should.[76]  However, he also did some things incorrectly, like not acting appropriately

---

[73] The Court uses the word "revoked" instead of "suspended" for a reason.  Any person or entity whose privileges are revoked by this Court's Order will have to reapply for privileges to practice at the end of the revocation period, at which time the Court will consider their application as well as their compliance with this Opinion and the Order of revocation.  Readmission will not be automatic.

[74] UST Ex. 35-33 is a direct reach out from Scanlan to Fenner in connection with the Sperro Program, and the Court believes that Scanlan was well aware of the Sperro Program.  Further, as LSC's internet marketing expert, his fingerprints appear to be all over the hard sell tactics used by LSC/Upright.  Scanlan, Tr. 102-103, Day 4.  In harmony with *Bishop*, whether the structure of LSC/Upright and Scanlan's role in it pass muster under Illinois law is a question the Court will leave to appropriate Illinois authorities.

[75] In 2016, LSC paid over 68% of its substantial gross revenues to Royce Marketing (Advertising) and Mighty Legal (Leased Payroll), captive companies of Justiva, for which it took deductions on Schedule 4 of its federal tax return. Upright Ex. P5; Scanlan, Tr. 114-16, Day 4.  The Court also considered Chern's testimony that through trial LSC has refunded approximately $100,000.00 in legal fees earned from Sperro and incurred over $1,000,000.00 in legal expenses related to its involvement in the Sperro Program.  Chern, Tr. 275, Day 3.  Even considering that testimony, the Court believes its sanction to be appropriate. Chern, Tr. 275-76, Day 3.  LSC is well able to handle this payment.

[76] The Court has no qualms about Delafield meeting with clients or witnessing signatures over Skype.  This district is approximately 400 miles long from Winchester to the Cumberland Gap.  Appropriate accommodations can be made with the proper use of technology.  However, simple telephone calls are unacceptable.

when it appeared he had a conflict of interest when the Sperro Program came to light, and also filing amendments to the petition without obtaining a wet signature, much less getting the clients' permission.  Although not under oath, Delafield was an officer of the Court and less than forthcoming at the Williamses' 341 meeting.

At the 341 meeting, Delafield professed ignorance as to why Sperro paid the attorney's fees for the Williamses in their case.  Clearly backpedaling, he said, "I don't know" and a "senior attorney at Upright can fill you in on the details.  I can't."  UST Ex. 3-2.  He knew full well what the Sperro Program was and how it worked.[77]  Delafield knew as early as December 2015, as the Williamses had told him, that the car had been used to pay their fees.  He also admitted in his Answer to the Complaint that he received the June 18, 2015 email about the New Car Custody Program from Chern.

Delafield fumbled even more fundamental responsibilities.  A lawyer with primary responsibility for a client's legal matter is under a duty to know how his client's file is being handled and cannot simply claim ignorance of another's misconduct.  *Cf. Banner v. Cohen, Estis and Assoc., LLP* (*In re Balco Equities, Ltd., Inc.*), 345 B.R. 87 (Bankr. S.D. N.Y. 2006) (discussing New York Rules of Professional Responsibility).  This was Delafield's case, and he was the responsible attorney before this Court.  The actions leading up to its filing, the filing itself, and the conduct of the case fall to him.  Moreover, Virginia Rule of Professional Conduct 5.1(c), applicable to attorneys practicing in this Court, provides as follows:

> (c) A lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if: (1) the lawyer orders or, with knowledge of the specific conduct, ratifies the conduct involved; or (2) the lawyer is a partner or has managerial authority in the law firm in which the other lawyer practices, or has direct supervisory authority over the other lawyer, and knows of the conduct at a

---

[77] Delafield's December 11, 2015 time entry stated, "Darren called Chicago and asked for additional information regarding Sperro."  UST Ex. 3-23, p. 4.

time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

Pt. 6, § II, Rule 5.1, Rules of Supreme Ct. of Va.

Here, Delafield ratified participation in the Sperro Program when he took the case and filed it. He was also a partner with knowledge of the conduct in question.[78] He knew about the Sperro Program before he met with the Williamses, and Chern testified that Upright in Chicago prepared the Rule 2016(b) disclosures, which it still does, and sent them to the local partners. The Williamses' Rule 2016(b) disclosure came with the reference to Sperro already on it. Once Delafield saw that, he could have declined to take the case or to file it once the Sperro Program was disclosed to him. Instead, he decided to move forward. That it turned out to be a scam is laid equally at his feet. In addition, Rule 5.3 provides as follows:

> With respect to a nonlawyer employed or retained by or associated with a lawyer: (a) a partner or a lawyer who individually or together with other lawyers possesses managerial authority in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer;
>
> (b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and
>
> (c) a lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if: (1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or (2) the lawyer is a partner or has managerial authority in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows or should have known of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

Pt. 6, § II, Rule 5.3, Rules of Supreme Ct. of Va.

---

[78] The Court has considered both Delafield's and Morgan's experience before this Court, as well as their roles as primary counsel in the cases before the Court. This is not the circumstance of a junior attorney early in his career inheriting a matter brought in by a senior partner. *Cf. Blue v. U.S. Dep't of Army*, 914 F.2d 525 (4th Cir. 1990).

Delafield, a partner in the firm, also bears equal responsibility for the actions of the

Upright sales staff touting and pushing the Sperro Program, as well as their unauthorized practice

of law.[79]   These are not trifling matters just requiring more sales staff education or training.[80]

The "senior client consultants," as outlined above in Part I(A), engaged in numerous instances of

providing impermissible legal advice to potential clients, albeit alleged violations of Upright's

policies, and some of it was just outright wrong, such as advising clients to hide collateral or

leave certain debts off their schedules.   Coupled with the pressure to hit sales and commission

targets, the fact that sales people engaged in overreaching conduct is not surprising.   Chern

testified that these are isolated instances and not illustrative of Upright's usual practices.

However, that the instances of sales personnel exceeding their ethical boundaries just happen to

be in the cases before this Court is a coincidence that cannot be ignored.[81]   Delafield professed

---

[79] "Any lawyer who aids a non-lawyer in the unauthorized practice of law is subject to discipline and disbarment. A lawyer has an affirmative duty to report unprivileged knowledge of such misconduct by another lawyer to the appropriate District Committee, and to discontinue his representation of a client when he discovers that his employment furthers the unauthorized practice of law by the client." Pt. 6, § I, Rules of Supreme Ct. of Va.

[80]   According to the Rules of the Supreme Court of Virginia, no non-lawyer shall engage in the practice of law in Virginia.  The Rules define the practice of law as follows:

(B) *Definition of the Practice of Law.* - . . .
   Generally, the relation of attorney and client exists, and one is deemed to be practicing law whenever he furnishes to another advice or service under circumstances which imply his possession and use of legal knowledge or skill.
   Specifically, the relation of attorney and client exists, and one is deemed to be practicing law whenever –
   (1)  One undertakes for compensation, direct or indirect, to advise another, not his regular employer, in any matter involving the application of legal principles to facts or purposes or desires.
   (2)  One, other than as a regular employee acting for his employer, undertakes, with or without compensation, to prepare for another legal instruments of any character other than notices or contracts incident to the regular course of conducting a licensed business. . . .
   (4)  One holds himself or herself out to another as qualified or authorized to practice law in the Commonwealth of Virginia.

Pt. 6, § I, Rules of Supreme Ct. of Va.

[81] In response to the argument that Upright facilitates the unauthorized practice of law, Upright asserts "[t]hat notion is both over simplified and unproven. While admittedly in these two cases senior client consultants violated protocols and arguably gave consumers legal advice, the Trustee has presented no evidence of their actions being

ignorance about much of what the sales people did and how the cases were handled in Chicago.

He knew few in firm leadership other than Chern or their roles at Upright.  He knew little about

how his Upright clients' funds were handled in Chicago.[82]  He should have known more about

all of these matters.  Delafield also has a past disciplinary history with this Court, specifically

designed to correct past practice deficiencies in this Court.  The Court believes lesser discipline

would not be effective.  Delafield's privileges to practice in this Court shall be revoked for a

period of one (1) year, and Delafield will be sanctioned $5,000.00 to be paid to the Williamses,

both to take effect within thirty (30) days of the Court's Order becoming final and unappealable.

Morgan is another matter altogether.  Morgan, more so than Delafield, was defiant in his

testimony, taking little responsibility for anything.  That he relied on his partners or his staff was

a frequent Morgan refrain.  He, too, bears responsibility for filing a case before this Court in

which his client was put into the Sperro Program.  He received Chern's Sperro rollout memo and

knew Scott was in the program from the start.  Morgan, Tr. 47-48, Day 4.  Moreover, his actions

in trying to advance the attorney-client privilege to shield his actions and that of Upright's were

self-serving and in conflict with Scott's interests.  The responsibility for Upright actions

attributable to the salespeople are as equally applicable to Morgan as to Delafield.

However, one of Morgan's practices, which he had no qualms about, is that he often does

not meet with his clients in person, much less meet with them to go over and witness schedules

being signed.  He often leaves that to his wife, a non-attorney, who he testified has "a superior

knowledge of the law" in that area.  In this case, the first time he laid eyes on Jessica Scott was at

---

widespread."  Upright Defendants' Post-Trial Brief at 72.  The sampling of the client consultants' actions in this case, combined with evidence as a whole, was enough to satisfy the Court that Upright has serious oversight issues.
[82] *Cf*. Delafield, Tr. 167-68, Day 2.

her deposition on June 2, 2017, nearly a year and a half after her case was filed.[83]  As Judge

Phillips stated in *In re Smith*, "[b]ankruptcy clients rely on their attorneys to explain an

unfamiliar and complicated process so that they can make informed, appropriate decisions.  *In re*

*Alvarado,* 363 B.R. 484, 487 (Bankr. E.D. Va. 2007).  An attorney has an affirmative duty to

meet with and counsel his clients, answer any questions the client may have and explain the legal

significance of their actions."  *In re Smith*, No. 13-31565-KLP, 2014 WL 128385, at *6 (Bankr.

E.D. Va. Jan. 14, 2014).  Judge Kenney in the Eastern District of Virginia echoed the same

sentiment, advising that "despite these advances in technology that allow parties to communicate

remotely and to file papers electronically with the Court, there is still a fundamental duty to meet

with the client and to obtain the client's original signature on the petition.  The filing of a

bankruptcy petition is an important, life-altering decision. The client must consider the risks (the

damage to one's credit, the transactional fees, and the possibility of a failed Chapter 13 plan after

paying into the plan for some period of time) with the potential rewards (the automatic stay, a

discharge and the possibility of a strip-off of wholly unsecured liens)."  *In re Tran*, No. 14-

11837-BFK, 2014 WL 5421575, at *7 (Bankr. E.D. Va. Oct. 17, 2014).   Leaving it to a lay

person to meet with the client, go over the petition and schedules, verify their accuracy, explain

the ramifications, answer questions, and obtain the signature is beyond the pale in this Court.[84]

---

[83] This brings up Morgan's use of appearance attorneys.  James McMinn, Morgan's former associate, was sent to the 341 meeting for Scott.  He never met her prior to that meeting, and he spoke to her for the first time "in the moments before the 341."  UST Ex. 31, Tr. p. 110.  In addition, she was a client of Upright Law, not one of Morgan's separate law firm where McMinn was employed.  Lines of separation between the two firms appear to have been blurred, if non-existent.  This too is unacceptable and shall stop.

[84] Delafield and Morgan are both further reminded of their obligations under 11 U.S.C. §§ 707(b)(4)(C) and (D), as well as Fed. R. Bankr. P. 9011 and Local Rule 5005-4(B).  *See First State Bank of Newport v. Beshears (In re Beshears)*, 196 B.R. 468, 472, n.2 (Bankr. E.D. Ark. 1996) ("At least one of the signatures purporting to be [the debtor's] was executed by his attorney. This is a violation of Rule 9011 which requires pleadings, *except a list, schedule, or statement, or amendments thereto,* to be signed by an attorney. The petition and schedules are required to be signed, under oath by the debtors themselves."). The cavalier manner in which such matters were handled in these cases will also stop.

This is unacceptable practice, and this practice shall stop.  The Court also notes Morgan has a past disciplinary record with the Virginia State Bar more severe than that of Delafield, and it believes that lesser discipline would not be effective.  Morgan's privileges to appear before this Court, directly or indirectly, including through his PLLC, shall be revoked for eighteen (18) months, and Morgan will be sanctioned $5,000.00 to be paid to Jessica Scott, both to take effect within thirty (30) days of the Court's Order becoming final and unappealable.[85]

Sperro, LLC is in default.  Sperro is directed to disgorge immediately all funds received from (1) the sale or disposition of any property for which it remitted funds to LSC/Upright in connection with a case filed in this Court, and (2) any funds paid to it by or on behalf of a lender to recover that lender's collateral in connection with a case before this Court.  Sperro shall provide full documentation to the UST of all such transactions.  All such funds shall be paid to the Clerk of this Court, to be held in the Clerk's registry pending further order of this Court. Sperro shall also, to the extent it has not already done so, provide to the Office of the United States Trustee a list of all clients referred to it from LSC/Upright nationally, as well as details pertaining to the recovery, sale, disposition and/or secured creditor redemption of any collateral in connection with the so-called New Car Custody Program.[86]

---

[85] The Williamses and Ms. Scott have been put through much stress, anxiety, and inconvenience in this case, including having to take time to appear for depositions and/or court.  The Court believes directing Delafield and Morgan to pay them the sum indicated is an appropriate sanction in combination with their revocation of privileges to practice before this Court. The Court's Order will also impose continuing legal education requirements in both fundamentals of bankruptcy law and ethics on Delafield and Morgan.

[86] Section 526(c)(5)(B) provides, in part, that ". . . if the court . . . finds that a person intentionally violated this section, or engaged in a clear and consistent pattern or practice of violating this section, the court *may* . . . –(B) impose an appropriate civil penalty against such person." 11 U.S.C. § 526(c)(5)(B) (emphasis added).  Because the Court has already imposed sanctions against LSC, Upright, Delafield and Morgan, including fining LSC and Upright, and sanctioning Delafield and Morgan $5,000.00 each, the Court elects to exercise its discretion and not award a separate civil penalty against LSC, Upright, Delafield and Morgan under Section 526(c)(5)(B).  Williams Count V and Scott Count IV are dismissed.

## CONCLUSION

Bankruptcy courts have long recognized that Congress sought to enact certain provisions of the Bankruptcy Code so that lawyers would preserve the integrity of the bankruptcy process and not treat bankruptcy matters as "matters of traffic." *See In re Worldwide Direct*, 316 B.R. at 646 and cases cited therein (addressing Section 504 of the Bankruptcy Code). The Bankruptcy Code provisions and Rules in play here are part of a larger structure, all of which operate in their own way to support those same goals. The integrity of the bankruptcy process was a distant thought in these cases. The pursuit of the next dollar of compensation was the primary consideration here, by Sperro, LSC/Upright, its organizers, and its local partners.

Local attorneys joining multi-jurisdictional law firms as local or limited partners cannot be both tall and short. An attorney cannot claim to be a partner in the firm and file cases with the Court as lead counsel, but yet claim no responsibility for what happens in the main office on the files the attorney decides to take. Attorneys considering joining firms with this business model should understand that, in this Court, while an injury might be initiated elsewhere – there is a real possibility the pain is going to be felt at home.[87] An appropriate Order shall issue.

**Decided this 12th day of February, 2018.**

UNITED STATES BANKRUPTCY JUDGE

---

[87] This was a difficult and vigorously contested case, and trial counsel on both sides are commended for their efforts. As a suggestion to the UST, if in the future deposition testimony is to be used at trial – and that deposition testimony refers to an exhibit – it would be helpful to the Court and anyone else reading the transcript to have the court reporter mark the exhibit for identification so everybody knows what document the witness is talking about. Tr. 261-64, Day 2.